UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | | |
|---|---|---|
| United States of America, | ) | File No. 26-mj-77 (SRN/ECW) |
| Plaintiff, | ) | |
| vs. | ) | St. Paul, Minnesota April 14, 2026 1:00 p.m. |
| Kirubele Adbebe, | ) | |
| Defendant. | ) | |

---

BEFORE THE HONORABLE ELIZABETH COWAN WRIGHT
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
**(MOTION HEARING)**

APPEARANCES

For the Plaintiff: U.S. Attorney's Office
ROBERT TUCKER, III, SAUSA
JESSICA STARK, SAUSA
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, Minnesota 55415

For the Defendant: Fredrikson & Byron
MANDA M. SERTICH, ESQ.
CHRISTOPHER J. MARKUSON, ESQ.
60 South Sixth Street
Suite 1500
Minneapolis, Minnesota 55402

Court Reporter: ERIN D. DROST, RMR-CRR
Suite 146
316 North Robert Street
St. Paul, Minnesota 55101

Proceedings recorded by mechanical stenography; transcript produced by computer.

**P R O C E E D I N G S**

**IN OPEN COURT**

(Defendant present)

THE COURT: Good afternoon, and please be seated.

All right. Good afternoon. I'm Magistrate Judge Elizabeth Cowan Wright, and we're here today for a motions hearing in the matter of United States v. Adbebe, Case Number 26-mj-77. The case is assigned to District Judge Susan Richard Nelson and to myself.

Let's take appearances of counsel, beginning with counsel for the United States, please.

MR. TUCKER: Good afternoon, Your Honor. Robert Tucker for the United States.

THE COURT: Okay. Thank you.

MS. STARK: And Jessica Stark for the United States, Your Honor.

THE COURT: Okay. Good afternoon to both of you.

And for Mr. Adbebe?

MS. SERTICH: Good afternoon, Your Honor. Manda Sertich of Fredrikson & Byron on behalf of Mr. Adbebe who is present in the courtroom with me.

THE COURT: Okay. Good afternoon to both of you.

Let me -- let me just talk about where we are. So Mr. Adbebe filed several motions. I have gone through

everything very carefully. I'm aware that some of the relief he requests, insofar as a request for an order to show cause and evidentiary hearing, obviously wasn't granted before today. That does not mean that I am denying those motions. It means that I wanted to set this hearing so that I could explore some of the issues.

I'm aware that we have new counsel for the United States. I'm not sure what happened to Mr. Arboleda.

Maybe, Mr. Tucker, can you just give me a little history of where we're at with the prosecution in terms of counsel change?

MR. TUCKER: Yes, Your Honor. As everyone is aware, there are the use of Army Judge Advocates throughout the entire DOJ here. And Mr. Arboleda was one of those. I, myself, am also one. He received orders to return to Memphis, I believe. I'm not 100 percent sure. But I have orders coming here.

THE COURT: Okay. And Ms. Stark is also a JAG or --

MS. STARK: Yes, Your Honor.

THE COURT: Okay. Great. Thank you. Thank you for that clarification.

So with the change in counsel and some other matters that have sort of come up or have been fleshed out by the briefing, I'm going to hear argument on all of the

motions today. I have an order in my head that I hope makes sense. There are some things that I want to explore with the Government and with Ms. Sertich to make sure that sort of everything is happening the way it -- it is supposed to happen consistent with the laws and Constitution of the United States.

So by going through this, I'm not intending to suggest anything. That I know that everyone in this room doesn't want to make mistakes and not comply with what we're required to do.

Okay. So with that, Ms. Sertich, I'm going to start with Dockets 30, 31, and 32, which are the -- I'm going to say maybe the less controversial motions. That's the motion for discovery and inspection, Docket 30; the motion for witness list, Docket 31; and then the motion for disclosure of grand jury minutes and transcript.

I think, Ms. Sertich, if you want to come up and just give me any additional argument or response now that we have the Government's perspective in the brief. And then I'll have -- Mr. Tucker or Ms. Stark can come up and respond, and I'll probably have some questions for you. But I'd love to hear from you first.

MS. SERTICH: Okay.

THE COURT: Okay. Thank you.

MS. SERTICH: Thank you, Your Honor. So as you

indicated, I will begin with discussing ECF Number 30, correct, the discovery -- motion for discovery and pretrial inspection.

THE COURT: Okay.

MS. SERTICH: There are seven, I believe, subrequests -- or eight subrequests within ECF Number 30. And I'll address each of those, although some of them group together, so I will group some of them together.

THE COURT: Sure.

MS. SERTICH: First, I will address the motions on Topics 1, 2, 3, and 8. Those are the requests for various forms of video footage and audio recordings.

THE COURT: Um-hmm.

MS. SERTICH: So far, Mr. Adbebe has received -- and this has been sort of piecemeal over time -- multiple videos, some just a few minutes long and some more than 20 minutes long, containing drone footage of the events leading up to Mr. Adbebe's arrest outside of the Whipple Building.

THE COURT: Um-hmm.

MS. SERTICH: And then at the moment that about 20 agents emerge to forcibly arrest Mr. Adbebe, the drone camera view shifts off to the side and does not capture the arrest itself.

THE COURT: Okay.

MS. SERTICH: The Government has disclosed a few videos that appear to be from cameras within the Whipple Building that capture Mr. Adbebe being moved within the Whipple Building.

I believe there is only one video that captures the time period of the alleged violation of 18 U.S.C. 111(a); the period, according to the Government's bill of particulars, after Mr. Adbebe is driven away from the main gate of the Whipple Building and then removed from the vehicle and held up against the side of an FPS vehicle.

The view of this footage appears to be from the -- from the front of the Whipple Building looking out towards the parking lot, so almost like a Ring -- you know, for lack of a better description --

THE COURT: Sure, um-hmm.

MS. SERTICH: -- a Ring video looking out at the parking lot. And the law enforcement vehicle that Mr. Adbebe was transported in and then the open door on that vehicle are positioned in a way that you really don't see much of Mr. Adbebe or the agents during what I believe to be the relevant time period for this case.

THE COURT: Um-hmm.

MS. SERTICH: I have made a request, and Mr. Tucker has agreed, to expand the scope of that video. I was informed by Mr. Arboleda that he individually edited the

videos to include just relevant time periods. The beginning of the video I'm talking about right now starts when the vehicle is already in view and the door is open. So Mr. Tucker has agreed to re-edit that video to show when the vehicle first comes into range.

THE COURT: Okay.

MS. SERTICH: But, you know, I do -- it is hard to believe that there were no cameras showing the opposite view, meaning cameras in the parking lot showing the front entrance of the Whipple Building, especially during January of 2026.

As to the other of these sort of subrequests, as best I can tell, there's been no disclosure of any body camera recordings, law enforcement vehicle camera recordings, or any collected third-party videos.

And what I've continually heard from the prosecution is that the defense has received everything that the prosecution has in its possession at that particular moment in time while we're having discussions, but no assurance that I have received all video footage.

THE COURT: Okay.

MS. SERTICH: In its response to the motion for discovery on March 25th, the Government stated that for its part, it did not believe there was any discoverable footage that had not yet been produced by the Government. And then

two days after that filing, received additional drone footage.

THE COURT: Okay.

MS. SERTICH: So I don't believe -- all of this to say I don't believe that the request should be denied as moot.

THE COURT: Um-hmm.

MS. SERTICH: I believe it should remain open and there should be an order. I believe this is very clearly evidence under 16(E)(i), material to preparing for Mr. Adbebe's defense.

THE COURT: Okay. Thank you. You know, just so I don't lose track, I'm going to ask Mr. Tucker to come up.

MS. SERTICH: Yep.

THE COURT: And then I'll call you back up, Ms. Sertich.

MS. SERTICH: Okay.

THE COURT: But I sort of planned for a long hearing because I felt like I was going to have a lot of questions.

So come on up, Mr. Tucker. Everyone will get their movement in for the day.

Okay. So, Mr. Tucker, I'm happy to let you generally respond, and then I'll probably have some questions.

MR. TUCKER: Yes, Your Honor.

So speaking to that defense docket at 30 with 1, 2, 3, and 8, those requests, Your Honor, the Government has provided what we have available to us. As counsel for the defense mentioned, we've had a conversation about an additional about six-minute clip of video that I am going through and scrubbing to see if that six-minute gap is available. If it is, of course, along with any discoverable footage that I do discover throughout this time, I'll be turning over to defense.

But at this point in time, Your Honor, it is the Government's contention that all of that footage has been turned over that is available to the Government at this time.

THE COURT: Okay. So I think here's my question, and I'm going to try to articulate it in a way that probably you'll hear throughout the hearing.

I'm not questioning that you and Mr. Arboleda have provided the footage that you have. Although, I am -- well, let me stop, though.

Are you able to explain why a document was filed with the Court stating that all available footage was provided; and then two days later, more footage was provided?

MR. TUCKER: At this point in time, I am not able

to explain that, Your Honor. I'm more than happy to look into that and provide additional briefing to the Court. I do not currently have that explanation for Your Honor.

THE COURT: Okay. So I don't think I need additional briefing. But this is what I'm concerned about, and I'm going to give you some direction in the form of an order.

It is important to know whether or not there is additional footage that is still outstanding. And, you know, I don't know what happened with the fact that a brief was filed saying all available footage had been provided and then more -- more footage was provided two days later. But I don't understand why there would be any reason for what we would call in civil practice a rolling production of video at this point. These events happened in January.

So I am going to tell you that the Court is directing and ordering the Government to determine if there is any more responsive video to Requests Number 1, 2, 3, and 8 in Docket Number 30. And the reason I'm doing that is because I think that -- well, first of all, I can't imagine it's that hard to figure out at this point, but we need to know if there's more video or not. And so I can't deny a motion as moot, which is what was asked in the brief, when it appears that it's not clear whether or not the video has all been produced.

So the goal here is to figure out is there more video; and, if so, and it's within the scope of Rule 16, get it produced, okay?

MR. TUCKER: Yes, Your Honor.

THE COURT: Okay. So I'm happy to hear anything else you want to say about that before I kind of wrap that topic up. Is there anything else you wanted to address the Court on with regards to Requests 1, 2, 3, and 8?

MR. TUCKER: No, Your Honor.

THE COURT: Okay. So just to be clear, I am granting the motion at Docket 30 as to Requests Number 1, 2, 3, and 8 insofar as the Government is ordered to determine if there is any additional video or audio recordings falling within the scope of those requests, and to produce them promptly to the defendant, if there is such -- such video or audio recordings.

I would suggest that it is a little -- you should check and see if there's any footage from the parking lot looking at the front of Whipple, basically. I mean, I think you weren't here in January, I'm assuming.

MR. TUCKER: Correct, Your Honor.

THE COURT: Okay. So it would be -- for those of us who were in the community and, you know, reading the news and that type of thing, it would be a little surprising to me if all of the cameras were facing out from Whipple. I'll

just put it that way. I don't know. I don't know what the situation is. But you are directed to go ahead and check on that too.

And then I think finally with regard to squad car camera or vehicle camera or body-worn camera, again, I don't know if there's anything responsive, but you should double-check, because when I watch the video that I have seen of the event -- and I'll get to that in a minute -- there were a lot of law enforcement officers in the area when Mr. Adbebe was arrested. And then it sounds like there's some subsequent proceedings, so to speak, that I haven't -- that I haven't seen but have been produced to the defendant. So you should double-check and see if there's any additional body-worn camera or squad car footage as well that's responsive.

I don't know, but that's the obligation I'm putting on the Government, just so we don't have this kind of piecemeal sort of rolling production that makes it really confusing for everyone.

MR. TUCKER: Yes, Your Honor.

THE COURT: Okay. And I think -- the only video that the Court has seen to date of this event is the FOX 9 video that has been filed by the defendant in connection with these motions. I'm not suggesting you needed to produce the video to the Court, that's not what I'm saying,

but I will say that -- well, let me ask you this: Have you reviewed that video?

MR. TUCKER: Yes, Your Honor.

THE COURT: Okay. All right. So we'll -- we can talk about that more later, but -- okay. Any questions as to Request Numbers 1, 2, 3, and 8?

MR. TUCKER: Not at the time, Your Honor.

THE COURT: Okay. Thank you.

Ms. Sertich, anything further as to those requests?

MS. SERTICH: No, Your Honor. Thank you.

THE COURT: Okay. Thank you very much.

All right. I'm going to have Ms. Sertich pop back up; and then, Mr. Tucker, you can -- you'll be back up in a moment, so, thank you.

So the motion -- I think I said this -- is granted insofar as I've directed the Government to do a search for any additional video responsive to 1, 2, 3, and 8.

All right. I think we have Request Number 4 next.

MS. SERTICH: Yes, Your Honor. And this relates to radio traffic, dispatch records, cell phone communications, and any other communications between agents and law enforcement regarding the incident.

And the Government states that it opposes this request, despite the fact that some cell phone

communications, which were text messages, were ordered to be disclosed by the Court to the extent that they constitute *Brady* or *Giglio* material. Mr. Adbebe has received what appear to be some text messages and dispatch records from the day of his arrest.

At first, according to the prosecutor, the defense was provided with text messages that were selected by the agents as being relevant to the incident.

THE COURT: Um-hmm.

MS. SERTICH: And when Mr. Arboleda called to ask if that was sufficient, I advised it was my understanding that he had a duty to review the materials to determine what, within these text messages, should be disclosed pursuant to the Court's order. And Mr. Arboleda later informed me that he conducted such a review and had nothing further to disclose.

These records are material to preparing Mr. Adbebe's defense pursuant to Rule 16(E)(i). There is already significant evidence disclosed by the Government indicating that no one actually believed Mr. Adbebe forcibly assaulted anyone on January 13th, and the records could contain additional evidence on that point.

And so, again, I do not believe this is an order that should be denied. And we may have to, again, rely on some representation that this has been a complete production

of evidence, but at this time, I don't feel secure in that.

THE COURT: Okay. So, Ms. Sertich, it looks to me like one of the Government's arguments with respect to Request Number 4 is that Mr. Adbebe is only entitled to this information to the extent it constitutes *Brady* or *Giglio* information. I'm not sure if you are disagreeing -- it sounds to me like what you are saying is you think what you've gotten is *Brady* and *Giglio*, and you are worried that there might be more that you don't have. Do you disagree that that cabins it or not?

MS. SERTICH: Well, I think -- I also think we would make the request pursuant to Rule 16(E)(i). We need to have our arms around what this situation looked like at the Whipple Building that day. And so to the extent there's additional *Brady* and *Giglio*, obviously Mr. Adbebe is entitled to that information, but also making the request under Rule 16(E)(i).

THE COURT: Okay. And that's that it would be material to his defense?

MS. SERTICH: Yes, Your Honor.

THE COURT: Okay. And I -- I know you've articulated a couple of defenses that you may be asserting in this case. And one of the responses I saw from the Government was, well, either that Mr. Adbebe hadn't asserted the defense yet, or that it wasn't clear sort of what the

theory were.

So just to kind of frame our discussion here, can you give me -- I'm not asking you to disclose your trial strategy -- but kind of an overview of what you think the defenses are that this evidence is relevant to.

MS. SERTICH: Certainly, Your Honor. In the affidavit supporting the complaint, there is an allegation that Mr. Adbebe forcibly spit on an individual. We disagree with that, factually speaking.

THE COURT: Um-hmm.

MS. SERTICH: But even if we were to agree that Mr. Adbebe spat, the word "forcibly" is a legal term of art that has meaning under the case law.

THE COURT: Um-hmm.

MS. SERTICH: And there is no -- there's been no indication that there's evidence supporting forcible assault of any kind.

THE COURT: Okay. This is going to sound perhaps like a stupid question, but that's fine. I'm trying to understand the difference between forcibly spitting and other spitting and why that matters for a legal perspective.

MS. SERTICH: That's fair. So in order to forcibly assault someone, which, you know, could, in some circumstances, include spitting --

THE COURT: Um-hmm.

MS. SERTICH: -- you have to put the individual in fear for their safety or their life.

THE COURT: The person who is spit upon?

MS. SERTICH: Yes, Your Honor.

THE COURT: Okay. Okay. So your -- your response on Number 4 is that -- you can tell me if I'm paraphrasing wrong, but the concern there is that while some information has been produced, you're not confident that all information -- responsive information that is either *Brady*, *Giglio*, or falls under Rule 16 as material to Mr. Adbebe's defense has been produced?

MS. SERTICH: Correct, Your Honor.

THE COURT: Okay. All right. I think I understand that. Thank you, and I'll hear from Mr. Tucker.

Okay. Mr. Tucker, I'm going to ask you a couple of questions, and I don't mean them to sound anything other than I just genuinely need to know these answers. Okay?

So, you know, I had a case like a year and a half ago where *Giglio* and the Government's requirements under *Giglio* was hotly disputed, and the parties cited a large number of provisions from the Justice Manual and from this U.S. Attorney's Office's internal provisions as to how the office handles *Giglio*. So nothing should be different, right, in this case?

MR. TUCKER: Correct, Your Honor.

THE COURT: Okay. So I just want to understand, because of the transition and all of that, so you're -- are you familiar with the Justice Manual, just as a starting point, the Department of Justice's Justice Manual?

MR. TUCKER: Yes, Your Honor.

THE COURT: Okay. And you've been -- have you been trained on Section 9-5.001, which is the *Brady/Giglio* obligations?

MR. TUCKER: Yes, Your Honor.

THE COURT: Okay. Did you look at it like recently with respect to this case?

MR. TUCKER: I have been looking at it while I've been here, Your Honor.

THE COURT: I bet, okay, now that I think about it. So, okay.

So you are familiar with what that manual says about the obligation to have a candid conversation with law enforcement and all that?

MR. TUCKER: Yes, Your Honor.

THE COURT: Okay. And none of this is secret. It's on the internet. I pulled it up today. It's still the Department of Justice Manual as far as I know, so, okay.

All right. So I think, you know -- and then I guess the other thing I just want to make sure with this case is, you know, I did issue an order back in February, on

February 20th, requiring the Government to disclose text messages between its agents. Are you familiar with that order while I try to look for it?

MR. TUCKER: Yes, Your Honor. I'm aware of it.

THE COURT: Okay. All right. So that's the background. So why don't you let me know where you think the Government stands with regard to producing information responsive to Number 4 that's either *Brady*, *Giglio*, or material to a defense?

MR. TUCKER: So, Your Honor, the Government is of the opinion we have been turning over all the *Brady* material that we've become aware of. Additionally, Your Honor, at this point in time, we do believe these requests are outside of the scope, if we're looking for the matter as a whole, to the Rule 16. Of course we are going to continue to comply with *Brady* and *Giglio*. If we are looking at *Giglio* right now, Your Honor, I do believe that's a bit untimely, looking at, you know, witnesses, preparing for testimony.

But at this point in time, Your Honor, the Government is of the contention that of course the obligation under *Brady* and *Giglio* will be honored. And at this point in time, we've turned over everything to meet those obligations currently, Your Honor.

THE COURT: Okay. Have you had -- have you had candid conversations with the law enforcement who might be

witnesses yet?

MR. TUCKER: I have not had candid conversations with each of the agents, Your Honor.

THE COURT: Okay. Do you know who the agents are? I'm not going to ask for their names. I just want to know if you know who they are.

MR. TUCKER: We do have the list of agents involved, Your Honor.

THE COURT: Okay. Well, I think the question of when *Giglio* information should be provided is -- based on my earlier case that I had -- somewhat unsettled insofar as if I do set an evidentiary hearing and any witnesses to testify in front of me, their credibility would be an issue for their testimony in front of me. So, you know, I can either make a formal ruling, but I'm going to tell you that if there were *Giglio* information, I would expect the Government -- and I think the Government has always done this historically, has provided *Giglio* information for any witness who would be testifying at a motion hearing.

MR. TUCKER: Absolutely, Your Honor.

THE COURT: Okay. So I think with regard to Request Number 4, what I'm hearing you say is that -- well, let me back up.

It sounds like you don't think that there is information that would fall within the scope of Rule 16, but

what I'm hearing is that the defendant does think that there could be information within the rule of -- scope of Rule 16.

So do you have reason to think there's not information that's responsive that falls within the scope of being material to a defense, or are you just saying you don't think Rule 16 applies, or something else?

MR. TUCKER: I believe at this point in time what has been requested is outside the scope of Rule 16.

THE COURT: And why is that?

MR. TUCKER: So we look at it, it covers the defendant's statements; and I do understand the requirement for things that have a significant materiality to the preparation of a defense. Fully understand both of those. And any of those that would meet that level, obviously the Government would be turning over to, you know, be in compliance with Rule 16. At this point in time, however, what we believe being requested, for all radio traffic, dispatch records, all communication, I believe that goes outside the scope of Rule 16.

THE COURT: Okay. So I think what I just heard Ms. Sertich say is she's limiting her request to Rule 16, *Brady*, and *Giglio*. Is that right?

MS. SERTICH: Yes, Your Honor.

THE COURT: Thank you.

So do you have concerns with the scope of the

request as narrowed by Ms. Sertich?

MR. TUCKER: We do not. The Government is going to comply with Rule 16, *Brady*, and *Giglio*, of course, Your Honor.

THE COURT: Okay. All right. Thank you.

So I am going to -- with that narrowing of the scope -- and I understand your prior concerns, Mr. Tucker -- I'm going to grant the motion insofar as the Government is ordered to provide information responsive to Request Number 4 that falls within the scope of *Brady*, *Giglio*, and Rule 16, including information that is responsive -- excuse me -- material to the defense of the case.

As I've stated, if any witness is called to testify in a motion hearing before me, I expect the *Giglio* information to be provided to the defense before that motion hearing and in sufficient time for the defense to make use of it. Understood?

MR. TUCKER: Absolutely, Your Honor.

THE COURT: Okay. Anything else on this?

MR. TUCKER: Not from the Government, Your Honor.

THE COURT: Thank you. Let me just check with Ms. Sertich.

MS. SERTICH: No, Your Honor. Thank you.

THE COURT: Okay. Thank you. And we'll do another switch and turn to Number 5. I think there might be

a little overlap here, but, Ms. Sertich, you can tell me.

MS. SERTICH: Agreed, Your Honor. I think -- I think we have overlap between 5 and 7.

THE COURT: Okay.

MS. SERTICH: Okay. So Number 5 asks for documents, communications, et cetera, between agents and the U.S. Attorney's Office or DOJ regarding potential or actual charging, declination, presentment, or dismissal of criminal charges related to Mr. Adbebe. And Number 7 relates to any and all draft affidavits prepared in anticipation of the potential charging by felony complaint.

Other than, obviously, having received the complaint and the misdemeanor information, Mr. Adbebe has not received any records in this category. The Government argues that draft affidavits are considered opinion work product, entitled to absolute protection from disclosure. But such protection does not necessarily provide absolute immunity. The Eighth Circuit has held that the protection provides almost absolute immunity, which can be overcome in rare and extraordinary circumstances, such as, where a drafter engages in illegal conduct or fraud.

This case before the Court presents an extraordinary circumstance. The affidavit in support of Mr. Adbebe's felony complaint was sworn out by a special agent with HSI, Richard Berger. Special Agent Berger swore

out a number of criminal complaints in January of 2026 that have now been entirely dismissed and often, in the view of many, because the video evidence undermined statements he wrote in his affidavits.

That alone is extraordinary and something that we thankfully have not experienced in this district with any regularity or maybe at all up to this point. But here the Government has not produced any video evidence of the alleged assault that it charged Mr. Adbebe with. And the third-party video we have of Mr. Adbebe's arrest, to some extent, does not line up with the sworn statement of Special Agent Berger in that portion of the affidavit.

And the witness statements produced in discovery to date, as I mentioned recently, undermine any assertion that Mr. Adbebe forcibly assaulted any person, even simple assault, which is what Special Agent Berger wrote in that affidavit.

THE COURT: And are these witness statements from the law enforcement who are present at the scene?

MS. SERTICH: Yes.

THE COURT: Okay. Thank you.

MS. SERTICH: A review of Special Agent Berger's drafts may provide insight into whether there was any Government misconduct involved in bringing these charges against Mr. Adbebe, and we believe he is entitled to this

discovery.

THE COURT: Okay. So I understand your argument with regard to Number 7.

MS. SERTICH: Uh-huh.

THE COURT: With regard to Number 5, to be honest, I had thought that it was overlapping a bit with Number 4.

MS. SERTICH: Okay.

THE COURT: So -- but I -- but we jumped ahead, and that's fine.

So Number 5 is asking for all documents, communications, phone records, et cetera, between and among DHS, CBP, FPS, the U.S. Attorney's Office for the District of Minnesota, the Department of Justice, and any other law enforcement or prosecuting authorities regarding the charging, declination, etc. Do you have additional argument to make on that point? I know that I had ordered some text messages to be produced as we've discussed.

MS. SERTICH: Yes, Your Honor. And the reason that I grouped this with Number 7 is because I perceive there that there could be the opportunity for some sort of work product protection asserted by the Government with respect to conversations about charging decisions and things of that nature. And that's what those communications specifically related to.

THE COURT: Okay. So is your concern there that

there might be information that would otherwise be producible -- required to be produced under *Brady*, *Giglio*, or Rule 16, but because the Government is asserting work product protection, it's not being produced?

MS. SERTICH: Correct, Your Honor.

THE COURT: Okay. Okay. I think I understand. And the basis for this is -- well, specifically as to Mr. Adbebe, the fact that the complaint has certain allegations in paragraph 6 that Mr. Adbebe believes are -- believes are inconsistent with what the FOX 9 video shows?

MS. SERTICH: Yes, Your Honor.

THE COURT: And apparently other statements that you have seen?

MS. SERTICH: Yes. Your Honor, as I said, I -- based on the evidence I've seen or listened to so far, I have not seen evidence of a forcible assault, again, as that is defined under the case law.

THE COURT: Okay. All right. I think I understand your position as to 5 and 7. And I'll hear from the Government now.

All right. Mr. Tucker, the reason I had asked a couple of minutes ago if you saw the FOX 9 video is because, as Ms. Sertich has now brought up, there were allegations in the original criminal complaint filed in this case -- not filed -- presented -- well, filed -- presented to a

Magistrate Judge, signed, and then filed in this case that, you know, based on what I've seen of the criminal complaint and the video, they're -- the video does not support some of the statements in paragraph 6 as far as I can tell insofar as paragraph 6 alleges that FPS inspectors approached Mr. Adbebe. Upon contact, he "resisted by pulling away from FPS 1," who was the first law enforcement agent cited, "and refused repeated commands to stop resisting and place his hands behind his back." I don't see that on the video. Do you see that on the video, the FOX 9 video?

MR. TUCKER: Your Honor, the Government's contention is that he was pulling away at those moments in time. As to the statements on the FOX 9 video specifically, Your Honor, while I have watched it multiple times, I've watched plenty of video, I'd be happy to review it again and provide additional briefing in regards to that video specifically. When we looked at charging, we looked at the totality that we had before us, Your Honor.

THE COURT: Okay. So I'm actually focused on the "refused repeated commands to stop resisting and place his hands behind his back." Did you see that on the video or hear it maybe is more accurate? I mean, standing here today, can you tell me that you heard it?

MR. TUCKER: I would have to re-review the video, Your Honor.

THE COURT: Okay. I don't hear it. Maybe it's just because my ears are bad, but I don't hear it. So I think where I'm going with this is a couple of areas, generally.

First, Ms. Sertich is making the argument for Mr. Adbebe that information that perhaps normally would be shielded by work product protection isn't entitled to that protection due to -- if it is true that the Government lied when this affidavit was submitted to a Magistrate Judge, that law enforcement lied and made false statements in this affidavit when it was presented to a Magistrate Judge for signature, she is alleging, as I understand it, that that would provide a basis for waiving work product protection. Do I have that right?

MS. SERTICH: Yes, Your Honor.

THE COURT: And probably some other arguments too, but I'm just trying to -- so when I look at this, I'm not really looking at the charging decision. I'm looking at, first of all, does this affidavit contain false statements? And as somebody who signs these -- and I know you weren't even here, but you're representing the United States and you are prosecuting the case. As someone who signs these, that's really, really concerning to me.

The other point I would make -- and I'm getting a little off topic from what the argument is for production

because I think, frankly, I'm going to probably require you to do some work and then there's going to be supplemental briefing as to Requests Number 5 and 7.

MR. TUCKER: Yes, Your Honor.

THE COURT: The other concern I have goes back to *Giglio*, and this is why I was focused on the manual and so on. I don't know, from this affidavit, who told Agent Berger that Mr. Adbebe engaged in the conduct that is described in the affidavit. I understand he's no longer charged by criminal complaint; but if the persons who provided that information to Agent Berger are persons who will be witnesses at trial, I believe the fact that they may have provided false information in this -- for purposes of drafting this affidavit, I would think that would fall within *Giglio*. Do you disagree?

MR. TUCKER: May I ask for some clarification, Your Honor?

THE COURT: Yes, absolutely. This is complicated, and, frankly, I've been thinking about it a lot, so ask your questions.

MR. TUCKER: So to be clear, I believe you're asking me if I believe if agents that would be testifying at let's say a trial or evidentiary hearing, as Your Honor mentioned --

THE COURT: Um-hmm.

MR. TUCKER: -- if the Government was going to call those agents to testify or they were going to testify at all and they happened to be the same agents that provided the information to Agent Berger, you're asking in that case would it not be *Giglio* material, their underlying drafts or work product in regard to the affidavit?

THE COURT: Well, no, I'm getting off the underlying drafts. I'm sorry. So --

MR. TUCKER: Okay.

THE COURT: I'll let you address that in a minute, but I think, frankly, I'm going to need more briefing because it sounds like you'll -- I've got questions about that too. But let me get to -- let's just talk about *Giglio*.

Let's say -- so Agent Berger states in paragraph 4 that he provided this affidavit based on personal knowledge, along with information he learned from other law enforcement, and the review of reports, written materials, and recordings. That's paragraph 4.

Now, if a law enforcement agent -- I mean, obviously Agent Berger got from somewhere the statements in paragraph 6. Do you have a copy of the complaint?

MR. TUCKER: I can grab it. Hold on a moment.

THE COURT: You should get a copy. Okay.

And co-counsel can come on back too. Okay.

(Mr. Markuson joins Ms. Sertich and Mr. Adbebe)

MR. TUCKER: Your Honor, I did not bring a copy of the complaint today to address these motions, so I apologize in that regard.

THE COURT: That's fine.

(Ms. Sertich hands document to Mr. Tucker)

THE COURT: Thank you, Ms. Sertich. I appreciate that.

Okay. So just let me start over here. Paragraph 4 is Agent Berger saying he based this affidavit on his personal knowledge and information from other law enforcement and written materials. Okay? And then paragraph 6 contains -- well, in paragraph 7 -- but paragraph 6 contains certain statements about how Mr. Adbebe was alleged to have conducted himself during the incident that gave rise to these charges.

And what Mr. Adbebe is arguing is that certain allegations in paragraph 6 are inconsistent with the video that we do have from FOX 9. In particular, there's an assertion that, "Upon contact, Adbebe resisted by pulling away from FPS 1 and refused repeated commands to stop resisting and place his hands behind his back."

What I am telling you is that I have reviewed the only video that I believe is available right now of Mr. Adbebe's encounter with these people, and that I do not

hear anybody giving repeated commands to stop resisting and place his hands behind his back. I'm going to let you address that because we're not going to decide that today.

But here's my concern for *Giglio* purposes. Agent Berger got the assertions in paragraph 6 from somebody, because I don't think he's saying he was there himself. If the law enforcement agent who provided the basis for a statement -- this "upon contact" statement, if the law enforcement officer who provided that information is going to be a witness and this "upon contact" statement is false and contains false or inconsistent statements, I believe it would be *Giglio* information that the witness had provided a statement that was contradicted by video. I hope that's helpful, and now I will answer questions.

MR. TUCKER: That does help, Your Honor.

THE COURT: Okay.

MR. TUCKER: So I believe Your Honor's question then is if the Government came across that, would we provide that in *Giglio*? Is that --

THE COURT: Well, I mean, first of all, has anyone looked into why this statement is here when it's contradicted by the video?

MR. TUCKER: I'll happy to provide that in additional briefing, Your Honor.

THE COURT: That would be great. Thank you.

But, yes, do you agree that if it turns out that a law enforcement officer provided false information to obtain this complaint and that person was going to testify at trial, that the information would be *Giglio*?

MR. TUCKER: In that case, Your Honor, yes, an officer testifying at trial that has provided false information would be *Giglio*.

THE COURT: Okay. So that's -- thank you for saying that and agreeing. I thought I was on pretty sound ground, but it's always good to check; right?

So what I am saying is if you end up -- you -- I am directing the Government and ordering the Government to look into the statements in paragraphs 6 and 7 and determine if they were false or if they're inconsistent with the video that you have. And, if so, you need to do a *Giglio* determination. If any of those people who provided the statements are going to be testifying at a motion hearing or trial, that you need to determine -- if they're -- if they are testifying, you need to provide the fact that they made false statements to the defense. That's what I'm directing you to do.

MR. TUCKER: Yes, Your Honor.

THE COURT: I don't know what the circumstances are, but we need to make sure that we have people testifying who are credible. So -- and I think we -- I don't -- I

think we're on the same page, but let me know, Mr. Tucker, if you disagree, or if you disagree with my order.

MR. TUCKER: No, Your Honor.

THE COURT: Okay.

MR. TUCKER: The Government understands the order.

THE COURT: Okay. And, again, my goal is to make sure that we have good testimony at trial and that Mr. Adbebe is entitled to what he's entitled to under *Giglio*. And my concern is just that with all of this transition, that some of this might get lost in the shuffle if I don't spell it out. So I'm not directing this at you personally, but I'm telling you because you are the prosecutor now, okay?

MR. TUCKER: Yes, Your Honor.

THE COURT: Okay. All right. The second piece, getting back to what you were talking about, is the communications and drafts piece. Okay. Let me ask you this: Are you able to say today whether or not the United States is withholding any information that would be required to be produced under *Brady*, *Giglio*, or Rule 16, but for the fact that it's work product protected? In other words, are there actually documents we're fighting about now? Not we, but you are.

MR. TUCKER: Understand. Your Honor, I don't believe it is our contention that we're fighting about any

documents like that. We will absolutely comply with Rule 16, *Brady*, *Giglio*, the order Your Honor has given today, of course.

THE COURT: Um-hmm.

MR. TUCKER: At this point in time, we are not aware of any documents in preparation or -- that are not work product that would also conflate or be in conjunction with *Brady*, *Giglio*, or Rule 16.

THE COURT: Okay. But it sounds like there are work product documents?

MR. TUCKER: Your Honor, I believe every case of this nature is going to have some level of work product, attorney work product, agent work product.

THE COURT: I mean that are responsive to these requests otherwise. Probably, is my guess.

MR. TUCKER: Yes, Your Honor. We -- if there was nothing at all, I don't believe we'd be here. But we do not believe there's any obligation to turn over work product, Your Honor.

THE COURT: Okay. So I think -- let me -- let me make a proposal for counsel as to how to proceed, and then I would welcome input from both Ms. Sertich and from you.

We have an affidavit that, as I've indicated, I think has statements that are inconsistent with at least a video that occurred of the incident. We have an order to

counsel to determine whether or not that is, indeed, the case. Maybe there's a good explanation. I don't know.

I think we need to figure out whether or not -- whether or not there are, in fact, inconsistent statements; and I'm trying to think of a way to do that that is both respectful of the Government's privilege and work product, but also is respectful of the fact that if, indeed, there were false statements, it might vitiate the work product protection, but I'm not going to decide that today.

So, Ms. Sertich, do you have a suggestion for how to proceed under these circumstances? I have some vague ideas, but -- I mean, I guess maybe -- can you come up? Maybe I can talk to you and Mr. Tucker at the same time about this one.

MS. SERTICH: I guess, Your Honor, the one thing off the top of my head is that there's always the possibility for some sort of ex parte review before anything gets disclosed --

THE COURT: Sure.

MS. SERTICH: -- to the defense. And so if Mr. Tucker identified drafts of documents that he thinks might fall in this area we're discussing right now --

THE COURT: Um-hmm.

MS. SERTICH: -- he could provide those to the Court to make a determination about whether you believe

those are discoverable or not.

THE COURT: Okay. Mr. Tucker, your reactions to that? So I would be reviewing them ex parte back in chambers.

MR. TUCKER: The Court absolutely has the power to order that if that's what they want. Personally, Your Honor, the Government believes that this is pretty clear so far. We have Rule 16 requirements, *Brady* requirements, *Giglio* requirements. We also do have work product protection. So we believe anything that falls within those requirements and is not work product, the Government absolutely has or will turn over.

THE COURT: Okay. I think -- I think part of my concern here is that in my direction to you to figure out what happened with this affidavit -- and I'm speaking generally, but really what I'm doing is -- directing you to do is ascertain if there's a *Giglio* obligation arising out of these statements -- I think the -- I want to proceed cautiously and with respect to everybody's concerns here.

So, Mr. Tucker, I'm going to have you provide an update on what you learn about these statements in the complaint, along with a description of materials in the Government's possession that are responsive to Requests Number 5 and 7.

It's 5 and 7, right, Ms. Sertich?

MS. SERTICH: Yes, Your Honor.

THE COURT: Okay. That are responsive to 5 and 7 that the Government is withholding on work product grounds.

Question, go ahead.

MR. TUCKER: To be clear --

THE COURT: Um-hmm.

MR. TUCKER: -- you would like an update, not documents or anything themselves, but an update on what is discovered looking through those materials --

THE COURT: Um-hmm.

MR. TUCKER: -- going through those materials that is work product that we're discussing here, or just anything that does not fall under that that we -- or is in the gray area there potentially?

THE COURT: Yeah, I think two things: First of all, an update as to what was discovered as to the concerning statements in the affidavit, so paragraphs 6 and 7. Just you can look into why those statements -- who made those statements, and I guess maybe the Government is going to take the position that they're not inconsistent with the video, so you'll have to figure that out. But you should give me an update as to the results of your investigation into paragraphs -- well, paragraphs 6 and 7. That's one piece; just an update.

MR. TUCKER: Yes, Your Honor.

THE COURT: Okay. The second piece is determining what has to happen with the assertion of work product protection in response to these discovery requests. I can't imagine there's a large volume of documents, but I don't know for sure -- do you know, Mr. Tucker? -- that might potentially be responsive.

MR. TUCKER: I do not have a number off the top of my head, Your Honor. I'd be happy to provide that to the Court.

THE COURT: Yeah, I think that would be -- I think what would be -- okay. I've got it.

In addition, you should provide me with basically the -- the same -- like a privilege log, a privilege log for what documents are being withheld by the Government on work product protection grounds that would otherwise fall within the scope of *Brady*, *Giglio*, or Rule 16.

Everyone is writing furiously. I did request a court reporter because I knew we were going to need a lot of attention to detail, so I'm happy we have one. I will issue a written order as well, but the transcript will have more detail. So you're free to take notes obviously; but, just so you know, a transcript has been requested for a particular reason, okay?

MS. SERTICH: Thank you, Your Honor.

THE COURT: Yes, you're welcome. Okay.

So, Mr. Tucker, does that kind of clarify, like the privilege log equivalent and then the description of what happened with paragraphs 6 and 7, okay?

MR. TUCKER: Description of what happened, totally understand. Privilege log would be for documents that would be Rule 16, *Brady*, or *Giglio*, but the Government is asserting the work product. Understood.

THE COURT: Yes, that is exactly right.

Okay. Great.

Anything else for those two requests, Ms. Sertich?

MS. SERTICH: No, Your Honor.

THE COURT: Okay. Mr. Tucker, anything else on those two requests?

MR. TUCKER: No, Your Honor.

THE COURT: Okay. Thank you. Then we can turn to -- I don't think everything is going to take this long today, just so you know.

We can turn to the next -- I think we're going back to something. I've got so many papers.

MS. SERTICH: ECF Number 31.

THE COURT: Oh, no, I think we're still on Number 6.

MS. SERTICH: Oh, no.

THE COURT: Request Number 6 for the discovery motion.

MS. SERTICH: Oh, there we go.

THE COURT: Yeah.

MS. SERTICH: You are correct.

Okay. Your Honor, on Number 6, I think this one will be quicker, if that's the right word. This relates to training records or curricula for any of the law enforcement officers involved in Mr. Adbebe's arrest and the incident alleged in the Information.

Mr. Adbebe has not received any records in this category. The Government objects to any early disclosure of these records, so, you know, the defense requests that these be provided in a reasonable time. And if they are not produced, obviously the defense can seek these records via a trial subpoena if it comes to that.

THE COURT: Okay. Okay. Thank you.

All right. Mr. Tucker, come on up. I don't think there's really a dispute here. It's just more of a making sure order here, so...

I think the response from the Government in writing was that you were aware of your obligations, and you intended to comply.

MR. TUCKER: Correct, Your Honor.

THE COURT: Okay. And I know we've talked about this a lot, so I'll just grant the motion as to Request Number 5 [sic] insofar as the Government is, again, ordered

to comply with its *Brady* and *Giglio* obligations and to disclose -- well, *Brady* information should be provided promptly upon discovery, of course. Go ahead.

MR. TUCKER: Your Honor, I believe -- I may have misheard. Did you say on 5 or 6? I thought we were talking about 6 here.

THE COURT: We are. My apologies.

MR. TUCKER: Okay.

THE COURT: We are talking about 6. Thank you.

So I'm going to order the Government to comply with *Brady* and *Giglio*, again; and then also state that to the extent there's *Giglio* information, it should be provided sufficiently in advance of any testimony from the witness, either at trial or a hearing, that the -- you know, that the defendant can make use of it, which I believe was the Government's intent anyway.

MR. TUCKER: Correct, Your Honor.

THE COURT: Okay.

MR. TUCKER: May I go back just one moment?

THE COURT: Um-hmm, yeah.

MR. TUCKER: On the privilege log, do you have a specific format you would request for that, or could we just kind of go document by document if there's multiple in that regard?

THE COURT: I think document by document is

helpful. If you have an e-mail chain, usually like a thread, you know, people usually can lump that together as to e-mail chain discussing the charging, that type of thing. I don't know if either of you have any civil practice experience?

MR. TUCKER: No, Your Honor.

THE COURT: No? Okay. All right. You might find Federal Rule of Civil Procedure 26. It describes what has to go on a privilege log. I'm just going to make the record super clear here. I'm not ordering the Government to comply with the Civil Rule of Procedure. I know they don't apply, but I think it is helpful guidance in terms of what's useful on a privilege log.

MR. TUCKER: Understood, Your Honor.

THE COURT: How much time would you like to do that? I should have asked you.

MR. TUCKER: May I confer one moment, Your Honor?

THE COURT: Um-hmm. Yeah. Yeah.

(Mr. Tucker and Ms. Stark confer)

THE COURT: While they're talking, could counsel who came in just make his appearance for the benefit of the court reporter?

MR. MARKUSON: Of course, thank you. Chris Markuson with the defendant.

THE COURT: Okay. Thank you, Mr. Markuson. Also

at Fredrikson?

MR. MARKUSON: Correct.

THE COURT: Okay. Thank you.

MS. SERTICH: Your Honor, I made a note on your sheet. Mr. Markuson was over in Judge Schiltz's chambers, had a hearing before this, so that's the reason he was a little bit late.

THE COURT: Understood. Mr. Markuson, I did have advanced notice that you were running late, so no concerns, and I appreciate you coming over. I know it's a pain to get here from Minneapolis.

MR. MARKUSON: Thanks, Your Honor.

THE COURT: Okay, Mr. Tucker, what are you thinking?

MR. TUCKER: Your Honor, in light of all the orders going on here --

THE COURT: Um-hmm.

MR. TUCKER: -- trying to kind of keep everything as congruent as we can --

THE COURT: Yeah.

MR. TUCKER: -- the Government would request four weeks from today.

THE COURT: Okay. Four weeks.

So, Ms. Sertich, I know that's four weeks. Your client is not in custody. Is that okay?

MS. SERTICH: Yes, Your Honor. No objection.

THE COURT: Okay. Great. You've got your four weeks, Mr. Tucker.

MR. TUCKER: Yes, Your Honor.

THE COURT: And I'm just going to give you a deadline date. May 12th.

I think that covers all of Docket 30.

Ms. Sertich?

MS. SERTICH: Agreed, Your Honor.

THE COURT: Okay. Thank you.

Mr. Tucker, anything else on Docket Number 30?

MR. TUCKER: Nothing from the Government, Your Honor.

THE COURT: Okay. Thank you.

All right. Ms. Sertich, let's turn to 31. Hopefully a noncontroversial motion.

MS. SERTICH: Yes, Your Honor. Similar to the motion -- or the subpart of the motion we just discussed, the Government agrees to provide a potential witness list to Mr. Adbebe and the Court within a reasonable time before trial or in accordance with the scheduling order. I -- the defense had suggested three weeks. I'm not sure if the Government believes that is unreasonable or if we're just waiting for a court order on this --

THE COURT: Sure.

MS. SERTICH: -- but either way, I think we can find a reasonable solution here.

THE COURT: Okay. Thank you. That is my sense as well. Of course, a witness list would be -- would be required at some point.

Mr. Tucker, do you object to three weeks before trial?

MR. TUCKER: No, Your Honor. No objection from the Government.

THE COURT: Okay. Great. Thank you.

So I will order the Government to provide a witness list three weeks, 21 days, before trial in this matter. I imagine Judge Nelson will have her own specific details as to a witness list, but I will order the witness list to be within three weeks.

That reminds me, I was not notified that a consent came in to Magistrate Judge jurisdiction. I think I made it pretty clear at the last hearing that it didn't matter to me and I took no offense, but my understanding is that there's no consent to Magistrate Judge jurisdiction. Is that right?

MS. SERTICH: I believe that is my understanding as well, Your Honor.

THE COURT: Okay. All right. So I'll be issuing an R&R on any dispositive motions.

Okay. Let us turn to the next -- I think 32.

Okay. This is the grand jury motion.

MS. SERTICH: Yes, Your Honor. The Government does not argue in its response with Mr. Adbebe's assertion that the charging process in this case proceeded in an unusual fashion. Instead, the Government states that it will provide the Court with information ex parte that will make clear why the motion should be denied. Obviously if information is being provided ex parte, the defense doesn't know what the defense doesn't know.

But Magistrate Judge Elkins recently held in a similar case that not presenting a case to the grand jury does not implicate Rule 6 secrecy rules and unsealed the Government's sealed or ex parte letter confirming that the Government did not present the case to the grand jury.

And so while we obviously don't know if that is a similar situation here, if there is an ex parte communication in a letter confirming the Government did not present the case to a grand jury, Mr. Adbebe respectfully requests that such communications be unsealed.

THE COURT: Okay. Thank you.

All right. Mr. Tucker, did you want to respond to Docket Number 32?

MR. TUCKER: Yes, Your Honor.

THE COURT: Come on up to the podium.

MR. TUCKER: Your Honor, the Government absolutely

will disclose any grand jury material that qualifies as *Brady* or *Jencks*, as you can see from the Government's response, but we do not acknowledge the existence or nonexistence of any grand jury proceedings.

Additionally, Your Honor, there is a bit of a policy argument to take into consideration here. If we -- if the Court were to require this disclosure, it's creating a slippery slope for future litigation as it relates to grand jury secrecy. If the United States is required to answer either way, this ultimately does provide an alert to defense counsel to whether their client is being investigated by the grand jury or not, which is a violation of grand jury secrecy in the Government's opinion.

THE COURT: What -- do you have any case law to support that position? Because when I look at Rule 6, the language I see is that the secrecy requirement applies to matters occurring before a grand jury. And so if there was no presentment to a grand jury -- sorry -- if there was no presentment to a grand jury, there was no matter occurring before a grand jury. So do you have any case law to support the position that Rule 6 would apply if nothing was presented to the grand jury?

MR. TUCKER: No, Your Honor. The Government's position is that by requiring a disclosure whether or not that occurred, that it inherently allows for essentially

investigation by defense counsel to determine whether or not one was held for their client -- or a grand jury was held. If it were -- if that's what were to be ordered here, a disclosure, it would inherently -- our argument, the policy argument, no case law behind it, Your Honor, we understand it's a policy argument --

THE COURT: Okay.

MR. TUCKER: -- is that by requiring disclosure whether or not grand jury occurred, can allow for defense counsel in the future to file a motion -- file motions such as these to make a determination of whether or not there's any ongoing grand jury procedures.

THE COURT: I see. I understand your concern. You're basically saying if the case was not presented to a grand jury here, but the Court grants the motion on that basis, going forward, defendants will know -- be able to request information to determine if they are the subject of a grand jury investigation, because if they weren't, the Court would just say so?

MR. TUCKER: Correct, Your Honor.

THE COURT: Okay. But if they -- I'm just trying to understand when that would come up, because obviously if there's a criminal complaint, the Government has a certain amount of time to either present it to a grand jury or not. So it seems like a fairly limited scope of concern.

MR. TUCKER: Understandable, Your Honor, if that's how the Court feels. We still believe that -- we do not acknowledge the existence or nonexistence of any grand jury proceedings here and that any grand jury proceeding that -- or any grand jury material that qualifies as *Brady* or *Jencks* would be disclosed.

THE COURT: Okay. Okay. I understand the Government's argument. I did look at the reasoning by Judge Elkins in a similar case, and Judge Schultz, David Schultz, also recently decided this issue as well in another case. So I agree with the reasoning of Judge Elkins and Judge Schultz, and I would reach this decision independently in any event.

But in the Court's view, the language of Rule 6 is clear that it applies to matters occurring before a grand jury, and here I'm going to unseal the Government's submission at Docket 46, which is filed ex parte. And I will deny the motion for disclosure of grand jury minutes and transcript as moot, because this case was not presented to a grand jury, and, therefore, there was no matter occurring before a grand jury. Rule 6 is not implicated, but there are no responsive materials.

So, okay. Thank you, Mr. Tucker. Interesting issue.

MR. TUCKER: Yes, Your Honor.

THE COURT: All right. We have sort of the -- the other motions to turn to. Let me just check and see if counsel need a break, or if you are ready to proceed with those. Ms. Sertich?

MS. SERTICH: No break needed here, Your Honor.

THE COURT: Okay. Mr. Tucker?

MR. TUCKER: The Government's ready, Your Honor.

THE COURT: Okay. Thank you. Let me check with the court reporter.

THE COURT REPORTER: I'm good.

THE COURT: Okay. Thank you.

All right. So, Ms. Sertich, why don't you come on up. We'll talk about Mr. Adbebe's motions for an order to show cause, discovery, and protective order.

MS. SERTICH: Thank you, Your Honor.

Your Honor, in this case, it is Mr. Adbebe's position that the Government unquestionably violated a remarkably clear sealing order, and the defendant here is entitled to some relief for that violation. And I -- since I know, as you've said, you've read all the filings in this case, I'm going to attempt to focus more heavily on my response to the Government's -- focus more heavily on the Government's response to the motion.

First, the Government doesn't address the pretext involved in seeking the sealing order. When a prosecutor

seeks a motion to seal, there are several bases upon which a motion can be sought: to ensure safety of law enforcement partners, to protect against the risk of impeding an ongoing investigation, to protect the reputation of individuals who may not ultimately be indicted, to avoid disclosure of issues impacting national security, or to protect information obtained from a Title III wiretap, to just name the most common. In each case, the prosecutor must determine which of these individual bases applies to the case and the records at hand.

Here, the Government provided the Magistrate Judge with three reasons for the sealing, all of which were clear misrepresentations of the Government's case, investigation, and intentions with respect to Mr. Adbebe.

First, the Government stated that the documents set forth facts regarding an ongoing criminal investigation, but there was no ongoing criminal investigation at this time. The events of the crime were complete, the Government had seized Mr. Adbebe's phone on January 13th, and there is no indication that any evidence of the crime could have been destroyed absent sealing.

The discovery produced to date indicates no investigation that took place between January 13th and the application for the sealing order, and the Government makes no argument otherwise.

Second, the Government stated that the affidavit contained information that, if disclosed, could potentially impact the privacy of individuals who ultimately may not be indicted. The only other person, other than law enforcement officers, who presumably ran no risk of indictment who is named in the complaint affidavit, was Mr. Adbebe. This was another misrepresented basis for sealing.

And, third, the Government stated that nondisclosure of the documents was necessary for the safety of the officer conducting the investigation and who would be arresting the defendant.

Law enforcement contacted Mr. Adbebe the very next day after getting this sealing order signed and asked him to self-surrender at the courthouse for his initial appearance, which he did, peacefully. No arrest, no safety concerns.

And to be clear, these aren't misrepresentations by a SAUSA who is new to the District of Minnesota and being hastily assigned to cases. These false justifications were signed by the chief of the criminal division for the U.S. Attorney's Office for the District of Minnesota.

In attempting to respond to this motion, the Government makes arguments that are shockingly illogical. The Government's lead argument in responding to the motion for an order to show cause is hardly believable; that the Government didn't violate the sealing order because the

former Attorney General Bondi didn't post or otherwise disclose the actual under seal documents to her X account.

And I want to walk through a couple of hypotheticals to highlight why that position is so illogical. So let's say that unlike this case, and as occurs in many criminal cases, the Government legitimately moves the Magistrate Judge to seal the case because of the concerns for the safety of law enforcement officers effectuating an arrest of the defendant. In other words, if the defendant learned that he was going to be arrested, he might take steps to fight or otherwise harm law enforcement upon their arrival.

Now, let's just say hypothetically -- not that I think this would happen -- that someone who works at the agency executing the arrest warrant knows the defendant and calls and tips him off about the complaint. The Government's position here today appears to be that such a disclosure would not violate the sealing order because the tipster didn't send the actual documents to the defendant. And that's an absurd result. And in any serious world, the Government would not make that argument.

Or let's say that, unlike this case and as occurs in many criminal cases, the Government legitimately moves the Magistrate Judge to seal the case because publication of the facts in the affidavit could compromise an ongoing

investigation, possibly because they will simultaneously execute a search warrant at the time of the defendant's arrest and try to gather additional evidence.

And let's say -- not that I think this has -- you know, is happening in our district -- but somebody involved in the system calls the defendant and tips him off about the complaint, and then the defendant destroys evidence before law enforcement could execute the arrest warrant.

The Government's position here today is that such a disclosure would not violate the sealing order because the tipster didn't disclose the actual complaint or affidavit to the defendant. This is not a serious argument.

And this is why, as reflected in ECF Number 6, the Government moves to unseal the case at the initial appearance, and the Court grants that motion.

The Government continues its campaign of misrepresentations to the Court right on page 2 of its response, arguing that the information about Mr. Adbebe and his arrest were public before former -- the former Attorney General's X posts, stating that the posts contained information available to the public, such as, Adbebe's name, his arrest, along with his photo, and an indication that he had been arrested for allegedly assaulting federal law enforcement.

And in arguing that this information was public,

the Government points the Court to the FOX 9 News video of Mr. Adbebe's arrest, which was cited in the defense's motion, which the Government fails to acknowledge does not mention Mr. Adbebe's name, does not include any information about charges against him, and does not even show his face.

Such an argument feels particularly ironic given that this same department refuses to disclose the names of masked agents who shot a U.S. citizen, Alex Pretti, even though under the argument in their response, such information is public because third-party videos depict them in that shooting.

The Government takes issue with the defense's argument that one of their bases for seeking the sealing order, to protect individuals mentioned in the Indictment who may not be indicted in the future, for which Mr. Adbebe is the only possible candidate, because they ultimately did charge Mr. Adbebe with a crime.

Setting aside the unquestionable harm to Mr. Adbebe and his case from the mass distribution of his name and image with false accusations, the Government's argument further demonstrates that the Government's motion to seal this case was a farce. None of the bases that they placed before the Magistrate Judge as reasons to seal were necessary or supported by fact.

The real reason the Government sought the sealing

order was to execute an elaborate social media campaign to sow fear in the defendants and other protesters. That's it.

The Government states that the *City of Campbell* case, which was cited by the defense for the proposition that the Government's conduct in violating a sealing order must be viewed in its full context and that a violation of a sealing order can occur where the contempt violates the spirit of a court order, the Government states that case is factually distinguishable from this case. But that's not unusual in this briefing. The Government also did not cite cases that weren't factually distinguishable, and that's because the Government conduct here is unprecedented.

But beyond that, the Government quotes a particular phrase in the *City of Campbell* opinion attempting to argue that the defense strategically avoided this phrase in the briefing. But to the contrary, the defense appreciates the phrase that the Government highlighted. And they quoted, "When it is doubtful whether a decree of injunction has been violated, a Court is not justified in punishing for contempt, either criminal or civil, for the reason that no one can say with a degree of certainty that the authority of the Court needs to be vindicated or that the aggrieved party is entitled to remedial punishment."

Here, there is no doubt that the sealing order was violated. The reasons that the Government requested the

sealing order were pretext. And we can all say with a high degree of certainty that the Court needs to be vindicated, and Mr. Adbebe is entitled to remedial punishment. The reasons for violating the seal were inappropriate and impermissible under DOJ's and the U.S. Marshal's own policies.

The Government argues that there was a legitimate law enforcement purpose in the former Attorney General posting Mr. Adbebe's information to her X account. But the U.S. Marshal's policy cited and linked in the defense's motion describes law enforcement purposes that may be -- that may warrant releasing photographs of defendants prearrest. And that is when a fugitive has not yet been captured. It's obvious why there would be a public interest in knowing what a fugitive looks like.

After arrest, there are limited circumstances where public release of photographs can serve a law enforcement function. Like where the public should be notified that a particularly notorious fugitive has been apprehended, or to encourage victims and witnesses to come forward for criminal proceedings.

Instead, the Government showed you its hand right there in its response. They posted the picture of Mr. Adbebe in shackles. And just to be clear, Mr. Adbebe is in shackles for absolutely no reason. He had just

self-surrendered to the courthouse that day and posed no threat to anyone. He was placed in shackles for the express purpose of taking this picture.

And the Government tells you they posted that picture for purposes of general deterrence. If this were a legitimate law enforcement purpose for releasing photos of arrestees, it would apply to every single case. What the Government is telling you here is that the purpose of the posting of the picture and of the posting was to prop up this publicity stunt meant to scare lawful protesters into abandoning their First Amendment rights.

Having established that there was a violation of the court order, the next question is whether the Government can be held in contempt for this violation of the sealing order. The Government notes three reasons for civil contempt, all of which are met here:

First, when a person misbehaves in such a way as to obstruct the administration of justice. Second, when an officer of the Court misbehaves while performing their official duties. And, third, when a person violates a lawful court order.

As we've already discussed, all three of these circumstances authorizing a Court to punish contempt have been met. The Government violated the sealing order. The prosecutor misrepresented the reasons the Government moved

for a sealing order. The former Attorney General obtained and blasted out photos of Mr. Adbebe post-arrest, and the conduct was an attempt to obstruct the administration of justice.

As to that last point, we haven't talked about that one so far today. And while the Government says that the defense did not articulate any obstruction of the administration of justice, that was a very selective reading of Mr. Adbebe's motion.

The defense clearly noted the potential obstruction for the administration of justice, the intimidation of Mr. Adbebe and other potential witnesses, and the impact on Mr. Adbebe's potential for receiving a fair trial when the former Attorney General of the United States prematurely declared him guilty in a social media post.

And what Mr. Adbebe is relying on to obtain sanctions, as noted in the defense's motion, is the Court's inherent authority to sanction; to dismiss actions, assess attorney's fees, impose monetary or other sanctions for conduct which abuses the judicial process.

The Government cited to the *Chambers v. NASCO* case for this standard that I just mentioned, but avoided quoting the following from *NASCO*:

"Courts of justice are universally acknowledged to

be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." Here, the social media posts show anything but decorum or respect. The Government was not silent when it was ordered to be silent, and the Government did not adhere to the Court's lawful mandate.

The Government baselessly argues that the defense has failed to demonstrate how the conduct in question has interfered with the orderly and expeditious disposition of a case, abused the judicial process, or tainted his future trial or the integrity to further proceedings, all of which would warrant the Court's use of the inherent authority sanction.

The Government makes this argument even where the defense quite clearly pointed out that the orderly and expeditious disposition of the case has been impeded by the -- excuse me -- intimidation of potential witnesses; where the defense quite clearly pointed out that the judicial process was abused when the Government made misrepresentations to the Magistrate Judge in order to obtain a sealing order with the purpose of executing an inappropriate publicity blitz designed to intimidate; and where the defense quite clearly pointed out that Mr. Adbebe's ability to obtain a fair trial in any

jurisdiction reached by former Attorney General Bondi's post, meaning essentially every jurisdiction, has been impeded by the Government's inflammatory and unethical statements about Mr. Adbebe to an audience of 3 million.

And because the Government said this wasn't addressed, I'll just point out those arguments are on pages 13 through 15 of Mr. Adbebe's motion.

And so the final question remains, what is the remedy? That's challenging in a highly unusual case like this. But the Court has the inherent power to fashion sanctions when a party's conduct abuses the judicial process and is tantamount to bad faith.

Under this authority, the Court can order that posts be removed, prevent the Government from further disclosure of the inflammatory material, order discovery relating to the manner by which we went from Mr. Adbebe self-reporting to the courthouse and ending up the subject of social media posts that were viewed by millions.

THE COURT: And in your view, that authority is separate and independent from any Rule 16 support for the discovery that you've requested in this motion?

MS. SERTICH: Yes.

THE COURT: So you have at least two bases?

MS. SERTICH: Yes, Your Honor.

THE COURT: Okay.

MS. SERTICH: Yeah.

And also -- and another form of relief would be -- that the Court can order under its inherent authority would be an evidentiary hearing so that we can actually have this conversation on an educated basis.

These sanctions not only constitute appropriate punishment for the Government's conduct, but will allow Mr. Adbebe to determine whether he has a basis to move to dismiss the case or file other motions based on prosecutorial misconduct, vindictive prosecution. Right now the defense is in the dark about how events unfolded to result in the violation of the sealing order and the inclusion of his information online.

THE COURT: Do you think you've made the threshold showing necessary to obtain discovery on those potential defenses; vindictive prosecution, prosecutorial misconduct, outrageous Government conduct?

MS. SERTICH: Not yet.

THE COURT: Okay.

MS. SERTICH: So the Government argues that Mr. Adbebe can't receive this relief because there have been no cases cited indicating that posting a picture can constitute prosecutorial misconduct or malicious or vindictive prosecution. And essentially what needs to be done at this point is that we have to show that the elements

of those offenses could exist here.

Vindictive prosecution occurs when a prosecutor seeks to punish a defendant for exercising a valid legal right and such prosecution constitutes a violation of due process. A defendant can establish prosecutorial vindictiveness through two methods: with objective evidence of the prosecutor's vindictive or improper motive in increasing the number or severity of the charges; or, absent such evidence, a defendant may, in rare instances, rely upon a presumption of vindictiveness if he provides sufficient evidence to show a reasonable likelihood that the vindictiveness exists.

I believe we have made a showing sufficient such that Mr. Adbebe should be entitled to discovery and an evidentiary hearing.

THE COURT: That was actually my question. Do you think you've made enough of a showing for the discovery?

MS. SERTICH: I do, Your Honor.

THE COURT: Okay.

MS. SERTICH: Based on everything we've discussed --

THE COURT: Yeah, okay.

MS. SERTICH: -- so far.

THE COURT: Okay. Got it.

MS. SERTICH: Okay.

THE COURT: So I did quite a bit of research on this on my own because it's obviously a motion that we don't see very often. And I think in terms of various types of potentially problematic prosecutions, we have a selective prosecution, which I don't argue -- understand you to be arguing; and we have vindictive prosecution; and then we have -- I'm going to call it the general outrageous Government conduct defense, which is different from entrapment. Is that your understanding as well?

MS. SERTICH: Yes.

THE COURT: Okay. So you're arguing vindictive prosecution and outrageous Government conduct, which is obviously a pretty high standard.

MS. SERTICH: Yes, and I guess I've looked into this as well and haven't had a lot of experience in this area, but the outrageous Government conduct, I don't know if it's an exact match with this situation --

THE COURT: Um-hmm.

MS. SERTICH: -- but certainly could be a bases. I think the vindictive prosecution is probably more on point.

THE COURT: Okay. Let me talk -- I'm sorry, I do have questions, but I'm happy to let you finish.

MS. SERTICH: I'm finished. Thank you.

THE COURT: Okay. Okay. So I think -- you know,

I have a couple of questions with regard to --

MS. SERTICH: Sorry. For me, Your Honor, or for --

THE COURT: For you.

MS. SERTICH: Okay.

THE COURT: Yeah, I'm sorry. I should have been more clear.

MS. SERTICH: No. It's okay.

THE COURT: The -- I understand that the posts at issue are still up on the DHS account and the former Attorney General's account. Is that your understanding as well?

MS. SERTICH: It is, Your Honor.

THE COURT: Okay.

MS. SERTICH: Although I haven't -- obviously there have been changing circumstances, but my understanding is that the account for DOJ where the posts were made was the official account that was separate from Pam Bondi's individual account. So I believe that even with her departure, the official account would still have them.

THE COURT: Okay. And the DHS account, of course, is still in existence.

MS. SERTICH: Yes.

THE COURT: Okay. I think, you know, one of the -- so turning to the sealing issue; right. Setting

aside the propriety of these photographs -- the photograph of Mr. Adbebe being posted under any circumstances, the sealing order violation that you allege, it's -- it's really a timing issue; right? I mean, if the former Attorney General had waited two hours to tweet --

MS. SERTICH: Um-hmm.

THE COURT: -- she wouldn't have violated the sealing order; right?

MS. SERTICH: I think that's right. I think there are still other considerations. I know we're setting aside the nature of the photograph, but I also think the statements that were made in the posts play into some of these considerations surrounding, you know, bad faith, bad conduct given the Department of Justice's policies surrounding press releases, which obviously are done all the time after someone is charged with a crime.

THE COURT: Okay. And so with regard to the statements that were made -- and I -- I guess maybe this is something we should talk about, because I had the sense from the Government brief that they were sort of not really -- I don't think they addressed this.

But when you talk about the conduct, you know, are you referring to the statements where Mr. Adbebe is referred to as a rioter, somebody who's trying to impede and resist law enforcement, and somebody who wants to release rapists

and murderers to the community, or was there something else?

MS. SERTICH: Those are the statements, Your Honor.

THE COURT: Okay. All right. And then I have a -- this is more of a practical question, Ms. Sertich.

MS. SERTICH: Um-hmm.

THE COURT: The posts exist in the world. They're not going to go away completely no matter what this Court orders; right? I can -- the District of Minnesota -- it might have to be Judge Nelson, it might be a Report & Recommendation, I don't know, I have to look into that -- but if I were to order relief with regard to the current posts, it doesn't make them disappear because there's been articles and everything about these arrests.

And have you thought about -- well, I guess, so my first question is: Is there really a remedy? And I think your answer is yes.

MS. SERTICH: Sorry, is there what?

THE COURT: Is there really a remedy? And I think your answer is yes, notwithstanding the fact that the posts live on forever because of the internet.

The second question I have is: Have you thought at all about whether an order requiring these to be taken down might have the Streisand effect?

MS. SERTICH: It could, Your Honor, but it could

also -- I mean, it's hard to be having this conversation, because I obviously believe in what we do here every day. But Mr. Adbebe has been negatively impacted by the posting.

THE COURT: Um-hmm.

MS. SERTICH: I believe the Government could be negatively impacted by an order saying that was wrong.

THE COURT: Okay.

MS. SERTICH: And so there is some punitive effect to the Government there.

THE COURT: And a potential --

MS. SERTICH: Could be a Streisand effect, but I think there is the potential for some punitive aspect of that.

THE COURT: Do you think there is a remedial effect to Mr. Adbebe if the posts are ordered to be taken down?

MS. SERTICH: I do.

THE COURT: Okay. All right. I think those are all of my questions for you right now. Thank you very much.

MS. SERTICH: Thank you, Your Honor.

THE COURT: Yeah, thank you.

Okay, Mr. Tucker.

MR. TUCKER: Your Honor, as you can tell from the Government's motion, we do -- or response, we do oppose the defense motion for the show cause hearing for contempt and

sanctions there.

The Government absolutely is of the contention that the sealing order was not violated. When the language of a court order is unambiguous, it shall be construed according to its plain meaning, according to the *Minch Family* case here in the Eighth Circuit as cited in the response. And the contention here is that the sealing order was unambiguous. It sealed all documents filed. At that time, those documents were the complaint, the arrest warrant, and the agent's affidavit. Those were the documents that were filed until those -- until the sealing order was removed or it was unsealed.

THE COURT: The case was sealed as well.

MR. TUCKER: I apologize, Your Honor?

THE COURT: The case was sealed as well.

MR. TUCKER: Yes, Your Honor.

THE COURT: What do you think that means?

MR. TUCKER: Your Honor, the Government's contention here is that it sealed the case and those documents.

THE COURT: Okay. So the Government is taking the position that any person who saw the sealed documents was entitled to go tell anybody they wanted about the contents of those documents?

MR. TUCKER: I'm not saying that is a contention

of the Government, Your Honor.

THE COURT: Then tell me what you are saying, because that's what I'm hearing.

MR. TUCKER: We do -- the Government's contention is that the former Attorney General's social media post, the DHS post did not contain what was sealed by the Court's order to seal.

THE COURT: Okay. So if -- I mean, you know, Mr. Tucker, I'm going to tell you, this is actually really hard for the Court to talk about, because every time I think of a hypothetical, it is, like, extraordinarily painful for me to even suggest that anybody who works in the justice system would do any of the things I'm going to say.

So, for example, if I understand the Government's position, a person who empties the trash in my chambers at the end of the day and could see in the shred box a criminal complaint and affidavit that I had signed that day, the draft of it, would be entitled to go out to the media and notify the media that Ms. Smith is going to be arrested for a heinous crime before she's arrested. That's what I'm hearing from the Government. And I don't imagine that's what you mean to say, but that's what you are saying when you say "only the documents are under seal." Is that what you are saying?

MR. TUCKER: Your Honor, what the Government is

contending is simply that the Att- -- former Attorney General -- I apologize -- former Attorney General's posts and the DHS post did not contain what was under seal according to the Court's order.

THE COURT: And so anybody else could have done what the former Attorney General did? Someone on my staff? A janitor? Someone in your office?

MR. TUCKER: The Government's contention, Your Honor, is just that the posts and what was highlighted by the defense motion here, what it was pointing to, that those posts did not contain the documents, what was placed under seal by the Court at that time.

THE COURT: Okay. You said that several times. I understand you're in a difficult position. Do you have a response to any of the hypotheticals that I've proposed or that Ms. Sertich has proposed?

MR. TUCKER: I would be happy to provide additional briefing in response to those, Your Honor.

THE COURT: I do not think additional briefing is required on that. I likely will order supplemental briefing. So if you can find a case that supports the Government's position, you're welcome to find it and include it in your supplemental briefing. But I'm going to tell you right now that the idea that anybody can disclose information contained in a sealed complaint and affidavit so

long as they don't disclose the documents themselves, would certainly upend practice in this district when it comes to criminal proceedings.

So I think what would be more productive at this point would be for the Government to address other arguments, because the argument that the sealing order wasn't violated is not worth discussing anymore, unless there's anything else you want to say about it.

MR. TUCKER: Understood, Your Honor.

THE COURT: Yeah. Thanks.

MR. TUCKER: Your Honor, the Government is also of the contention that the request for civil contempt here is moot at this time. So the Government points to the burden for the finding of contempt, how it is initially seated with the moving party. And the Government is of the position that even if, for the sake of argument, that the Court were to say that the order was violated, the issue should still be found to be moot. Civil contempt is a coercive measure. It exists to compel future compliance, not to punish past conduct.

The Government unsealed the case the same day as Your Honor mentioned, within a few hours of when the post went up, and, therefore, additionally with having everything been unsealed, it is no longer in violation, if the Court were to find there was a violation, of any order.

That would leave us with nothing to coerce there.

THE COURT: Well, that's not really accurate, because there is a potential remedy in the form of having the post taken down; right?

MR. TUCKER: Your Honor, I do believe, as I continue to go through the response, I believe I'll hit on that.

THE COURT: Okay.

MR. TUCKER: If I don't, please ask me, and I'll address it, Your Honor.

THE COURT: Go ahead. That's fine.

MR. TUCKER: The defense motion also asked the Court to enforce its seal order in a manner that preserves the practical effect, but the seal order was removed. I don't believe there's a practical effect -- the Government does not believe there's a practical effect to enforce at this time. We are of the contention, as was noted, that the defense has not provided facts showing that in the three hours between the post and the removal of the seal order, that there was any loss or actual prejudice suffered by the defendant in that period of time.

THE COURT: Okay. Let's stop there. First of all, is the Government disagreeing that the contents of the DHS and the former Attorney General's posts contradict the Department of Justice guidelines for publicizing people's

photographs and appearances?

MR. TUCKER: Your Honor, if I'm understanding your question correctly -- and, again, I apologize for clarification -- you're asking if the Government is here today saying that the posts by DHS and everybody are not in contradiction with the internal guidelines of DOJ?

THE COURT: Let me ask it again. And you should always feel free to ask me a clarifying question, Mr. Tucker. It's fine.

The Department of Justice has policies that are set forth that -- in the code of -- in the Code of Federal Regulations, 28 C.F.R. 50.2, which were cited in the -- Mr. Adbebe's brief, that govern the release of information by personnel of the Department of Justice relating to criminal proceedings. The defendant has said that the release of his photograph and the statements that were made by DHS and the former Attorney General violate those policies. I didn't see any argument in the brief rebutting that position, so are you conceding that the posts violated the Department of Justice policies?

MR. TUCKER: Just one moment, Your Honor.

THE COURT: Sure.

MR. TUCKER: I'm just going to grab...

(Pause in proceedings)

MR. TUCKER: Your Honor, the Government's

contention here today is that if the Court were to find that those were in contradiction with the Department of Justice policies, the remedy for that is not a punishment here with the Court today, that being an internal policy.

THE COURT: Okay. I understand that Mr. Adbebe can't enforce the Department of Justice internal policy. I think my question is whether or not you are conceding that the post did violate the Department of Justice policy?

MR. TUCKER: Your Honor -- and I hate to be repetitive here -- I would be happy to provide additional briefing as to the Government's position on that. At this point in time, what I can tell Your Honor is we are not of the opinion that we were responding to a violation of internal policy. That we were responding to the defense motion, the request for contempt, sanctions, the show cause, the ones that we've been through today.

THE COURT: Okay. Well, I think the concern that I have is that presumably the Department of Justice policy is there for a reason. And I will preview for you that I do think the posts violated the Department of Justice policy. Although, I'm certainly -- you certainly will have permission to make responsive arguments on this.

But to the extent these posts did violate the Department of Justice policy, while that is not a policy that the Court can enforce or that Mr. Adbebe has a right to

enforce, necessarily, it certainly informs, in the Court's view, whether or not Mr. Adbebe has been harmed by the posts. And just to put the posts in context -- and whether or not the Government's conduct is outrageous or reflects vindictive prosecution or is impeding the administration of justice.

And to put the posts in context, we're talking about posts that, as I have indicated, refer to the defendant as a rioter. They make no qualification as to his -- the fact that he has only been charged. They describe him as an anarchist. And they describe him as a person who is, quote, "fighting to keep rapists, murders [sic], drug dealers, and predators in their community."

So the question for the Court is whether or not Mr. Adbebe has made a showing that that violates, I guess, his -- certainly it impedes his right to a fair trial and also is incongruent with the -- the dignity of the Court. And I don't mean "dignity" in the sense of being formal, but in the sense of the administration of justice and whether it's impeded the administration of justice.

So if the post did violate the Department of Justice guidelines, that certainly would be relevant to whether I thought and found that they impeded the administration of justice. That's why I'm asking about the guidelines. I'm not trying to enforce the guidelines.

MR. TUCKER: Understood, Your Honor.

THE COURT: Okay. Why don't you -- do you have additional points you want to make?

Do you have anything to say about the statements in the sealing petition and their veracity?

MR. TUCKER: Which statements in particular, Your Honor, just to be clear? I do have the sealing petition I'll grab real quick.

THE COURT: Okay. So Mr. Adbebe has argued that there were three false statements in the sealing petition. One of them is that there was an ongoing criminal investigation. One of them is that the petition was requested to protect the privacy of an individual who may not be indicted, and one of them was for purposes of safety of the investigating and arresting officers. And so the argument is that those are false statements. And I didn't see any response to that in the Government's brief, which, again, Mr. Tucker, I know you did not draft, but here we are, so...

MR. TUCKER: Your Honor, the Government absolutely -- to address one of those in particular, the officer safety, it absolutely does not believe that that's a false statement in any way.

And to address the other two, the ongoing investigation, and I believe the second one Your Honor is

pointing to being the actual acts, if I'm correct here. Let me make sure. Officer safety, ongoing investigation, and the individuals that may not be charged is what I have, Your Honor.

THE COURT: Um-hmm.

MR. TUCKER: In this case, I don't believe the individuals that may not be charged is what necessarily comes into play in this case. The defense -- obviously we're here so there was a charge filed, of course.

When we're looking at officer safety, I believe that is absolutely something that came into play here. As Your Honor, and has been mentioned a few times here, there was a lot going on here in January. I do believe that officer safety is something to absolutely be concerned with at that time. So I'm not seeing the alleged falseness of those statements, Your Honor.

THE COURT: Okay. So was there an ongoing criminal investigation of Mr. Adbebe at the time the sealing petition was signed?

MR. TUCKER: One moment, Your Honor.

THE COURT: Um-hmm.

MR. TUCKER: Your Honor, there was still a gathering of information. Additionally, when the sealing petition was signed, Your Honor, was prior to the date of these posts being alleged and the defendant obviously being

present for that initial appearance or the self-surrender, Your Honor.

THE COURT: Okay. So there was an investigation that was ongoing when the sealing petition was submitted because Mr. Adbebe wasn't arrested yet. That's your argument?

MR. TUCKER: Yes, Your Honor.

THE COURT: Okay. But if I'm understanding your argument correctly, it would have been fine for anybody who saw the documents to go out and tell Mr. Adbebe that he was going to be arrested and a complaint had been filed and signed; right?

MR. TUCKER: Are we going back, Your Honor, to the --

THE COURT: Um-hmm, we are, yeah.

MR. TUCKER: I don't want to be too repetitive for the Court, Your Honor, but it's the Government's petition that -- or the Government's condition -- sorry -- contention that the posts did not contain what was placed under seal by the court order.

THE COURT: Okay. Do you disagree that a booking photograph or a mug shot of the type that was posted about Mr. Adbebe is the type of information that could work a harm on his ability to obtain a fair trial?

MR. TUCKER: Your Honor, I -- the Government's

contention is that a harm has not been shown today by the defendant's motion.

THE COURT: What kind of harm do you think would need to be shown?

MR. TUCKER: I believe at this point in time, Your Honor, I'd be happy -- again, I don't want to be repetitive -- to provide that additional briefing. The Government's contention is that there has not been the actual harm or prejudice shown at this point in time by the defendant within that three-hour window --

THE COURT: I'm not talking about just the three-hour window at this point. I'm talking about the posts overall.

MR. TUCKER: Understood, Your Honor.

THE COURT: Yeah.

MR. TUCKER: And, again, our -- Government's contention here that we do stand by the motion, that there has not been a showing of that harm at this time.

THE COURT: So you think, and the Government's contention is, that Mr. Adbebe, his right to a fair trial will not be at all impeded by posts of him calling him a rioter and somebody who wants to let rapists and murderers back into the community? That that's not going to affect his right to a fair trial at all?

MR. TUCKER: Your Honor, the Government's position

is that at this point in time, the use of the inherent sanctions authority is unwarranted because there has not been a showing of that harm in -- or to go along with, as is seen in multiple citations the Government provided, such as, *Harlan v. Lewis*, *Gallagher v. Magner*, the *Martin* case. So where sanctions are imposed where there was actual harm that had occurred, such as, a dissuading of expert individuals from testifying in the *Harlan v. Lewis* case. The *Gallagher v. Magner*, it was actually a denial of request for sanctions where some e-mails were destroyed that should have been turned over.

I don't need to recite every single citation, of course, for the Court, but we believe that what we have here is not congruent with those cases where sanctions were appropriately applied. And that looking at all that, the inherent sanctions authority is not warranted in this case.

THE COURT: Do you -- do you have any argument to make on discovery or the request for a protective order?

MR. TUCKER: As for the request for the protective order -- the motion requesting the protective order, Your Honor, the Government is of the position that the defense has not met the good cause standard under Rule 16 requiring a specific, well-defined, or serious injury.

THE COURT: Okay. Anything on the discovery piece?

MR. TUCKER: Your Honor, on the discovery piece, are we looking at the evidentiary hearing, to delve into that, or the discovery motion as a whole?

THE COURT: The motion for Rule 16 discovery contained within Docket 27, which is not -- which is separate from the request for a evidentiary hearing. So the defendant has made specific requests for discovery.

MR. TUCKER: Yes, Your Honor.

THE COURT: And I'm getting to that page. It is on page 18 of Docket 27.

MR. TUCKER: Yes, Your Honor.

THE COURT: Okay.

MR. TUCKER: In there, Your Honor, the defendant is looking for the identity of agents who participated in or appeared in this post-surrender photograph. The Government's contention is that under Rule 16(a)(1)(E), the defense needs to show the information is material to preparing the defense, not just a logical connection, but that disclosure would significantly alter the quantum of proof in their favor.

THE COURT: So the defendant has articulated at least two defenses this might be material to. One of them is outrageous Government conduct, one of them is vindictive prosecution. Do you have any arguments specific to those defenses?

MR. TUCKER: First, Your Honor, if those defenses are being asserted, the Government does request the ability to brief and actually prepare the argument going forward on those.

At this point in time, we do not believe that the identity of those agents goes to the quantum of proof for any outrageous Government conduct defense here. I will note the burden in that is extremely high. As the Court noted, the burden for both of those is extremely high. If, what we are doing, is looking for a response to the raising of the defense of vindicative prosecution, outrageous Government conduct, the Government is going to request time to brief those responses, Your Honor.

THE COURT: Okay. So I wouldn't be deciding those defenses right now. I'm just trying to ascertain if the defendant has made enough of a showing for the Court to order discovery. So there's two -- let me just take a step back. Yeah. It's been a long hearing.

There's two bases, as Ms. Sertich articulated, Mr. Tucker, for what the Government -- or excuse me -- what Mr. Adbebe is seeking. One of them is that under Rule 16, Mr. Adbebe is entitled to the information on page 18 of their brief because he has defenses of outrageous Government conduct and vindictive prosecution and this information is relevant to those defenses. That's the Rule 16. That's

what I hear you arguing. So the question for the Court is whether he's made enough of a showing as to those defenses for me to order this discovery.

The second question, which I think -- well, is completely independent, is whether this discovery should be provided in any event because of the Court's concerns about whether the sealing order was violated and whether the Government should be sanctioned pursuant to the inherent authority of the Court, not just for the fact that the sealing order may have been violated, but for the overall conduct and what was said in those tweets.

So those would be the bases for discovery. I think -- I think what I'm hearing you say is you don't think there's a ground -- you don't think they've done what they need to show under Rule 16 to get the discovery. Is that right?

MR. TUCKER: Correct, Your Honor.

THE COURT: Okay.

MR. TUCKER: The Government would stand by its position, as we've spoken on quite a bit now, for the response to the second question you had there in regards to the potential sanction authority.

THE COURT: Okay. And I assume that you don't dispute that the Court has the authority to have discovery into whether, in fact, its order was violated or whether

sanctionable conduct occurred?

MR. TUCKER: The Government does not dispute the Court has the ability to order that. We just do not believe the threshold for that has been met here.

THE COURT: Okay. I think that is helpful and clarifies. I will give you the chance, if you have anything else you want to say on this motion, which is really three motions, Docket 27 -- sorry -- Docket -- yeah, Docket 27, 34, 35, and 36, four motions.

MR. TUCKER: One additional point, Your Honor. The Government's position here -- while I understand the defense has articulated that it wants that information in regards to the identity of agents in potentially preparing those defenses, the Government does not believe that the threshold for those defense -- for that hearing has been met, specifically, in part, because they have not actually shown that that would be material to the preparation of those defenses.

Specifically, when looking at Point (1) for that motion of discovery, the identity of the agents, if what we're calling into question is the conduct of the Government as a whole, and they are specifically pointing to these individual posts, the Government is not of the belief that the identity of those agents would be what -- the hinging factor, so to speak, in regards to whether or not the Court

were to find that that was outrageous conduct or not.

THE COURT: Okay. Can you explain why the people who participated in the photos, why their identity doesn't matter?

MR. TUCKER: If what -- it's not necessarily that it doesn't matter, as much as if what we are looking into is potentially vindictive prosecution or outrageous Government conduct as the two defenses we were just speaking on -- and I apologize for not providing clarity. That's what I was responding to there on those two.

THE COURT: Um-hm.

MR. TUCKER: When looking at the vindictive prosecution, outrageous Government conduct --

THE COURT: You can slow down just a little bit. Okay?

MR. TUCKER: I apologize.

THE COURT: Yeah.

MR. TUCKER: When looking at those two potential defenses, whether or not they're being raised and if the threshold on those has been met, the identity of the agent themself in a photograph is not something the Government believes has a materiality on the ability to raise either of those defenses. You're looking at the conduct as a whole in both of those situations -- or at least presumably the Court would be looking at the conduct as a whole in both of those

situations. And the -- to evaluate that conduct, I believe from all that we already have, from things that defense has brought forth, the Government -- the Court has, you know, asked questions on so far today, the identity of that agent would not be a -- not have a significant effect on the quantum of proof for those defenses.

THE COURT: I am thinking about what you have said. I will tell you this so that you can address it, if you can. I don't know that there is a good way. But one of the concerns the Court has about the sequence of events when Mr. Adbebe was arrested is literally how this happened. And so to some extent, the persons who were involved are going to be the people who have information about how this happened. If there were Assistant United States Attorneys who participated in this -- or obviously some law enforcement were there. We can tell that from the photos, unless people were wearing their jackets who weren't law enforcement.

MR. TUCKER: That's not the Government's contention, Your Honor.

THE COURT: Oh, okay. So do you have any response to the fact that the identities are -- you know, I'm trying to explain -- I'm not looking -- if I were to order this discovery, it wouldn't be because -- there are a lot of reasons why it might be important, and it's not necessarily

for punitive purposes. It's because understanding what happened is important to the Court. So do you have any response to that?

MR. TUCKER: I understand, I believe, where the Court is saying that understanding how we got to the conduct and the events that potentially, if the Court were to find, gave rise to the defense of vindictive prosecution or outrageous Government conduct, the understanding the how could be helpful. I do -- I can see that, Your Honor.

The Government's contention in response specifically to that Point (1) in the motion for discovery by the defense is that answering that how -- if, what the Court orders, is to answer that how, does not require the identity of the agents necessarily for a timeline of events or anything of that nature.

THE COURT: Okay. Okay. One other question. And I'm going to give Ms. Sertich a brief reply and a check-in with the court reporter to see if we need a break, and then we'll be wrapping up soon for anyone who might have additional proceedings.

Has any -- I'm asking this in a very high-level sense. Has there been any -- has the Government indicated in any way that it has looked into whether or not this conduct violated Department of Justice regulations and taken any steps to remediate any potential misconduct?

MR. TUCKER: Your Honor, I would request time to brief the response on that. I do not have the answer for you right at this time, Your Honor.

THE COURT: Okay. Okay. Thank you, Mr. Tucker.

Let me check in with the court reporter before you come up, Ms. Sertich.

(The Court confers with the court reporter)

THE COURT: I think we are getting to the end, Ms. Sertich, but I'm going to give you a reply.

MS. SERTICH: Yes. And I'll be very brief, Your Honor.

Your Honor, I would say, you know, you were asking Mr. Tucker these questions about the importance of the identities and the disclosure of the identities. In addition to what Your Honor articulated, those -- that would also be information necessary for an evidentiary hearing. The defense would not know who needs to be called for the relevant information to be put on at an evidentiary hearing without that information, so that is another reason.

I would also just request, on behalf of Mr. Adbebe, you know, we've heard the Government request supplemental briefing. Mr. Adbebe would also request supplemental briefing to describe the ways in which the defense has met the threshold for these sanctions and additional discovery.

THE COURT: Okay. Thank you, Ms. Sertich.

MS. SERTICH: Thank you.

THE COURT: All right. Before the Court are the defendant's motion for order to show cause, Docket 27; motion for Rule 16 discovery, Docket 34; motion for protective order, Docket 35; and motion for evidentiary hearing, Docket 36; along with the defendant's request to file Exhibits A, B, C, E, and F under seal.

I'm going to rule on this motion in part. I appreciate the arguments of counsel. I am cognizant that the attorney for the Government -- the attorneys for the Government who are here today were not here in January. I do note, however, that the defendant has pointed out that the complaint at issue was signed by an Assistant United States Attorney who's been at this office for some years. And that regardless of who's appearing on behalf of the United States, the obligations of the Government remain the same. This is not intended to slight you, Mr. Tucker. I'm just making it clear that we -- the United States has its obligations, no matter who's sitting in that chair.

MR. TUCKER: Understood, Your Honor.

THE COURT: Okay. So the motion for protective order, Docket 35, is granted insofar as the Court issues a protective order prohibiting the United States of America, and its officers and agents, from publicly or privately

disseminating or sharing the photograph of Mr. Adbebe in shackles taken after his self-surrender while he was being processed and booked or any similar photo.

The Court finds good cause for this protective order, including due to the potential for such photos to impede his right to a fair trial.

I make no finding on whether his right has been impeded at this point, but I do note a couple of things:

First, the Government has not articulated any law enforcement purpose served by circulating such photos, other than, quote, "general deterrence." This is a conclusory assertion that does not need -- address the need to circulate photos of Mr. Adbebe in shackles compared to simply circulating the information about the charges, which is -- has certainly been done in the past for other charges without photographs.

The Court's decision is also informed by, among other things, the discussion of the impact of booking photos on juries and how such photos can convey guilt in *Detroit Free Press Inc. v. United States Department of Justice*, 829 F.3d 478, at page 482, which is a Sixth Circuit case from 2016. I further note that the Eighth Circuit has recognized this effect almost every time it addresses whether the admission of mug shots at trial is prejudicial error. The Eighth Circuit did this recently in *United States v.*

*Richardson*, 92 F.4th 728 at 733, cert. denied by the Supreme Court, 145 S.Ct 228. In that case, the Eighth Circuit said the Government may have pushed the envelope, however, when it offered three mug shots. Another case is *United States v. Bohr*, B-o-h-r, 581 F.2d 1294 at page 1299, which is a case from 1978.

The Court is not persuaded by the Government's argument that Mr. Adbebe has not shown any harm sufficient to even order discovery or a protective order. The harm that arises from booking photos, mug shots, and similar photos is recognized in the law, and here those photos were published, along with several inflammatory statements, on a platform that circulates to hundreds of thousands, if not millions of people at this point.

The Court is concerned that the Government's position and contentions with respect to this motion shows that they do not take the concerns around Mr. Adbebe's right to a fair trial seriously, notwithstanding the fact that case law recognize this concern, and further suggests that the Government does not intend to respect these concerns going forward. The fact that the Government has taken this position confirms, in the Court's view, good cause for the protective order, because otherwise there is nothing to suggest that the Government would not tomorrow circulate and tweet the same photos again.

The Court also grants Mr. Adbebe's request to file documents under seal, Exhibits A, B, C, E, and F, in connection with the motion at Docket 27, as they implicate the same concerns regarding Mr. Adbebe's right to a fair trial.

Insofar as Mr. Adbebe seeks an order requiring the Government to remove these posts from social media, I'm going to defer ruling on that and consider it in connection with the motion for an order to show cause and for sanctions.

It is, indeed, unfortunate that the photos remain up on social media in view of the concerns that have been articulated by the defendants and by the Court, including Judge Foster at the initial appearances of Mr. Adbebe and other defendants, but the Court will turn to what relief the Court deems appropriate after further briefing.

I'm going to turn to the motion for Rule 16 discovery now at Docket 34. I have carefully considered the arguments that have been made today, along with the briefing. And I am going to grant that motion as follows:

The Government is ordered to disclose to Mr. Adbebe the identity of any DHS agents, U.S. Marshal Service personnel, and other Government personnel, including Assistant United States Attorneys or the United States Attorney from this district or elsewhere or JAGs, I suppose,

Special United States Attorneys, who participated, took, or appeared in the photograph of Mr. Adbebe in shackles posted by the former Attorney General Pamela Bondi before the case was unsealed and by the Department of Homeland Security Twitter/X accounts. This disclosure must be made no later than 14 days from the date of this order.

The Court also orders the disclosure to Mr. Adbebe of any communications by any officials at the Department of Justice or the Department of Homeland Security regarding the publication of that photograph by the former Attorney General's X/Twitter account, which, as far as the Court can determine, is the official Attorney General account, and by the Department of Homeland Security's X/Twitter account, or the timing of Mr. Adbebe's charging and self-surrender. This also must be made no later than 14 days from the date of this order. In other words, the Court is ordering the discovery sought on page 18 of Docket 27.

I find these disclosures are relevant in several respects and authorized by the law in several respects.

First, they are relevant to the issue of whether the Government violated the sealing order and whether the Government has a defense to such violation.

The Court notes that the Government is taking the position that the sealing order only applied to the documents named in the sealing order. The Court has serious

doubts about this position and finds that these disclosures are necessary and relevant to the question of whether the Government, at the time the posts were made, in fact, believed that they were not violating the sealing order and were adopting the defense that they are now making to this motion for contempt.

I also find that these disclosures are relevant and within the authority of the Court as to whether and whom the Court should sanction, the United States of America and its officials, with respect to the violation of the sealing order, posting a photograph of Mr. Adbebe in shackles, and disclosing his identity and the charges against him. Those sanctions would be pursuant to the Court's inherent authority and would be separate from any violation of the sealing order.

I find that those disclosures are relevant and necessary to determine whether the Government has abused the judicial process and acted in a manner tantamount to bad faith given its conduct with respect to the release of the photos, the charges against Mr. Adbebe -- the charge, I should say -- and the characterization of him in the tweets as a rioter "who had been resisting and impeding federal law enforcement agents" and an anarchist who is "fighting to keep rapists, murders [sic], drug dealers, and predators in their community." The Court also finds that these postings

may well implicate Mr. Adbebe's right to a fair trial.

The Court notes that the Government has not made any plausible argument that these posts conform with DOJ guidelines, including those set forth in 28 C.F.R. Section 50.2. And those guidelines may not be enforceable by Mr. Adbebe, but they do inform the Court's decision as to whether the conduct that the Government engaged in implicated Mr. Adbebe's right to a fair trial and whether the Government's defense to the allegation that it violated the sealing order or otherwise abused the judicial process has any merit.

I note that there's a non-precedential case, *United States v. Fry*, 2019 WL 856863, from the Northern District of California that involved somewhat similar conduct. It's non-precedential, and I acknowledge that, but I think it is the closest case I have found to the circumstances that have occurred here.

I will note that in *Fry*, relief was actually denied by the Court under these circumstances because the Government acknowledged that the leaks were inappropriate and said that it had and would follow its policies going forward, which included the mandatory reporting of misconduct.

But, here, the Government, in its briefing and in its argument, has made no such assurances. In other words,

there's no reason to believe that the Government thinks that any misconduct occurred or thinks that anything that happened was inappropriate, and, therefore, the bases for denying relief in *Fry* do not appear to be present here.

Based on the current record, the denials of misconduct by the Government are more similar at this point to the Government's sanctionable conduct in *United States v. Bowen*, 799 F3d. 336, which is a case involving prosecutors posting online comments speaking to guilt, which is also similar to the situation here.

I also, under an independent basis, order these disclosures under Rule 16. I find they are material to Mr. Adbebe's defense, including vindictive prosecution and outrageous Government conduct. And I find that Mr. Adbebe has made a sufficient evidentiary showing, including from the harm resulting from the posted photograph of him in shackles, which, again, is recognized in the case law, along with the comments referring to him in a number of derogatory and inflammatory manners. The Government's brief fails to address the impact of these statements.

I'm not making any finding on the defenses, but in terms of the requisite showing to obtain discovery, I find that Mr. Adbebe has met -- made a sufficient evidentiary showing. I also note there's been really no explanation offered for any of this conduct other than general

deterrence, which does not suffice given the nature of the posts.

So I'm not making any finding today as to whether the Government should be found in civil contempt or sanctioned pursuant to the Court's inherent authority. And this is a really unfortunate situation for everybody involved. But this conduct is concerning to the Court, the arguments made today by the Government are concerning to the Court, and the arguments made in the Government's briefs are concerning to the Court.

So the Court is ordering the Government to disclose the information necessary for the Court to ultimately decide the motion for an order to show cause and the motion for sanctions pursuant to the Court's inherent authority.

I also recognize there's a motion for evidentiary hearing. I think that's better decided after the discovery is provided and everybody has the opportunity to supplement their briefing. So that's what I'm going to do is set some deadlines for supplemental briefing after consultation with counsel.

So the motion at Docket 27 remains under advisement, as does the motion for evidentiary hearing at Docket 36.

Who would like to go first with the supplemental

briefing, or do you want to do simultaneous and exchanges?

Mr. Tucker, do you have any preference?

Ms. Sertich, do you?

MS. SERTICH: The Government -- the Government can go first.

THE COURT: Sure. Mr. Tucker, do you want to go first?

MR. TUCKER: Yes, Your Honor. Just in regards to timeline or whether or not simultaneous?

THE COURT: Whichever. If you want to do simultaneous, you can propose that. If you want to propose timing, I know you had said you wanted to supplement on a number of issues, and I recognize you didn't do the first brief, so --

MR. TUCKER: Yes, Your Honor.

THE COURT: So you currently have a May 12th deadline for some things already. Do you think you need more time after that? Or do you want to just do it all together?

MR. TUCKER: One moment, Your Honor.

THE COURT: Sure thing.

(Mr. Tucker and Ms. Stark confer)

MR. TUCKER: Your Honor, for simplicity sake, the Government is just going to ask to do it all together for May 12th.

THE COURT: Okay. That sounds good. So I'll look for your supplemental briefing. I know there were a number of issues you wanted to address, so I'll -- you know, you should just file whatever brief you think is appropriate, okay?

MR. TUCKER: Yes, Your Honor.

THE COURT: Okay. Thank you.

Ms. Sertich?

MS. SERTICH: Your Honor, I think simultaneous briefing might be tough because the Government is supplementing on some factual issues in addition to legal issues, and so we would request an additional four weeks after their briefing.

THE COURT: Four weeks? Okay. So your response would then be due June -- June 9th. Okay.

So Government's supplemental briefing is due on May 12th. The disclosures I ordered are due within 14 days. And Mr. Adbebe's response to the briefing will be due on June 9th.

I think that covers everything for today. I do appreciate counsel's patience. I know these are important issues for everybody.

Ms. Sertich, do you have anything else?

MS. SERTICH: Nothing further, Your Honor.

THE COURT: Okay. Thank you.

Mr. Tucker?

MR. TUCKER: Nothing from the Government, Your Honor.

THE COURT: Okay. Thank you all. We're adjourned.

THE LAW CLERK: All rise.

(Court adjourned at 3:15 p.m.)

* * *

I, Erin D. Drost, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter to the best of my ability.

Certified by: *s/ Erin D. Drost*

Erin D. Drost, RMR-CRR