**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

United States of America,

                Plaintiff,

v.

Kirubele Adbebe,

                Defendant.

Case No. 26-mj-00077 (SRN/ECW)

**REPORT AND**
**RECOMMENDATION**

---

This matter is before the Court on the Motion to Dismiss filed by Plaintiff United States of America ("the Government") (Dkt. 54). The Government seeks dismissal of the case without prejudice, pursuant to Federal Rule of Criminal Procedure 48(a). (*Id.*) Defendant Kirubele Adbebe consents to dismissal but seeks dismissal with prejudice. (Dkt. 58 at 1.) For the reasons stated below, the Court recommends that this case be dismissed with prejudice.

## I.     BACKGROUND

**A.     The Complaint**

On January 26, 2026, the Government charged Mr. Adbebe by criminal complaint with assaulting, resisting, or impeding certain officers or employees in violation of 18 U.S.C. § 111(a)(1) based on Mr. Adbebe's alleged conduct during a protest outside the Bishop Henry Whipple Federal Building ("the Whipple Building") in Fort Snelling, Minnesota on January 13, 2026. (Dkt. 1; Dkt. 1-1 ¶ 2.) This protest took place during Operation Metro Surge, launched by the Department of Homeland Security ("DHS") in

early December 2025 with a goal of enforcing immigration laws in Minnesota.  *See*

*Tincher v. Noem*, 816 F. Supp. 3d 931, 943 (D. Minn. 2026).  As of mid-January 2026,

Operation Metro Surge had been underway for weeks and "grown almost exponentially,

with widespread estimates that there [were] 3,000 immigration enforcement officers

operating in Minnesota, most of them in the Twin Cities" at that time.  *Id.* at 977.

Operation Metro Surge drew significant protest activity, including at the Whipple

Building, where detainees were being held and where immigration court proceedings take

place.  *Id.* at 958.

The Complaint charged that Mr. Adbebe "did forcibly assault, resist, oppose,

impede, or interfere" with federal officers who were engaged in, and on account of, the

performance of their official duties, and that the alleged conduct involved physical

contact with the alleged victims.  (Dkt. 1.)  The affidavit in support of the Complaint

alleged that:

> On January 13, 2026, at approximately 2:00 p.m., Federal Protective Service (FPS) Inspectors (hereafter FPS 1 and 2) responded to a call at the main gate of the Bishop Henry Whipple Federal Building in Ft. Snelling, Minnesota regarding a protester interfering with government vehicles. FPS Inspectors were wearing law enforcement equipment with law enforcement markings. From drone footage and photographs, FPS observed an individual on federal property spitting on at least one passing government vehicle, kicking tires, and opening the trunk of a moving government vehicle, in violation of 6 C.F.R. § 139.35. FPS subsequently identified this individual as Kirubele ADBEBE.
>
> FPS Inspectors, along with Special Response Team (SRT) personnel, approached ADBEBE to conduct an apprehension. Upon contact, ADBEBE resisted by pulling away from FPS l and refused repeated commands to stop resisting and place his hands behind his back. SRT personnel deployed chemical munitions, and ADBEBE continued to resist by keeping his hands

2

underneath his body. FPS Inspectors were eventually able to place ADBEBE in handcuffs.

After arrest, ADBEBE refused to enter the FPS vehicle despite multiple warnings and had to be physically assisted into the vehicle. Upon arrival to an area away from the main gate, ADBEBE ignored commands to exit the vehicle and was assisted out by FPS 2. During this time, an FPS Supervisor (FPS 3) responded to FPS 1 and 2. While being held against the side of the FPS vehicle, ADBEBE intentionally turned his head and forcibly spit on FPS 3's right forearm. FPS 1 and 2 personnel observed that ADBEBE drew in spit and deliberately spit at and on FPS 3.

I (along with other agents) reviewed drone footage of the incident. I identified ADBEBE opening the trunk of a government employee vehicle, spitting on a gray Dodge Durango, repeatedly kicking vehicles, and standing directly in front of a government vehicle to impede its travel. Additionally, drone footage revealed it took multiple law enforcement officers to subdue and arrest ADBEBE while he was on the ground.

(Dkt. 1-1 ¶¶ 5-8). Homeland Security Investigations ("HSI") Special Agent Richard Berger swore out and signed this affidavit. (*Id.* at 4.) A warrant for Mr. Adbebe's arrest based on the Complaint issued the same day. (Dkt. 2.)

**B.    The Sealing Order**

Also on January 26, 2026, the Government filed a Petition to Seal Documents signed by Assistant U.S. Attorney Kristian Weir, which was granted that day. (Dkts. 3, 4.) The Government's bases for sealing were that "[n]ondisclosure of the documents is necessary to prevent the ongoing investigation from being compromised and for the safety of officers conducting the investigation and who will be effecting the arrest of the defendants" and because:

The documents also contain identifying information of, and circumstances relating to, an individual or individuals allegedly involved in criminal activity in some way who may not be indicted in this case. Nondisclosure of the documents at this stage is also necessary to protect their identity and/or

to minimize the substantial risk that revelation of details set forth in the documents could cause to their reputation.

(Dkt. 3 at 1-3.)  As to the last basis, after the defense later pointed out that there were no such individuals named in the affidavit (*see* Dkt. 60 at 53:1-7),[1] the Government conceded this fact, describing this statement in the Petition as "inaccurate" and "a mistake" (Dkt. 56 at 1).

## C.      The Initial Appearance and the Government's Social Media Posts

The defense alleges (and the Government has not disputed) that on January 27, 2026, law enforcement contacted Mr. Adbebe and asked him to self-surrender at the courthouse for his initial appearance the next day.  (Dkt. 27 at 2; Dkt. 60 at 53:12-15.) Mr. Adbebe did so on January 28, 2026.  (*Id.*)  After Mr. Adbebe arrived at the courthouse, federal agents placed him in leg shackles and posed him for a photograph next to a federal agent wearing a jacket with "Police HSI" printed on the back, who was standing with his back to the camera.  (Dkt. 27 at 7; Dkt. 28 at 2 (Ex. A).)

At 12:53 p.m. on January 28, 2026, Pamela Bondi, who was the United States Attorney General at that time, made a series of posts on social media platform X from a verified account titled "Attorney General Pamela Bondi," which bears the seal of the United States.[2]  (Dkt. 28-1 (Ex. B) at 2.)  The account's "bio" field reads: "87th Attorney

---

[1]      Citations to transcripts are in page:line format.

[2]      Pamela Bondi also has a verified personal account titled "Pam Bondi."  *See* Pam Bondi (@PamBondi), X, https://x.com/pambondi [https://perma.cc/SG74-AS8Q].  The "bio" field of this account reads "Personal account of Florida's Former Attorney General and Former Special Advisor to President Trump - Office of White House Counsel."  *Id.*

General serving under the leadership of @POTUS Trump" followed by an American flag

emoji. (*Id.*, *see also* Attorney General Pamela Bondi (@AGPamBondi), X,

https://x.com/agpambondi [https://perma.cc/6BUQ-VL6B].) The first post stated:

> MINNESOTA ARRESTS — I am on the ground in Minneapolis today. Federal agents have arrested 16 Minnesota rioters for allegedly assaulting federal law enforcement — people who have been resisting and impeding our federal law enforcement agents.
>
> We expect more arrests to come.
>
> I've said it before and I'll say it again: NOTHING will stop President Trump and this Department of Justice from enforcing the law.

(Dkt. 28-1 (Ex. B) at 2.) That first post received more than three million views. (Dkt.

28-1 (Ex. B) at 2.) In a post replying to the first post, former Attorney General Bondi

added: "These are the names of those arrested today under 18 U.S. Code § 111

(Assaulting, resisting, or impeding certain officers or employees)" and listed sixteen

names, including Mr. Adbebe's first and last name.[3] (Dkt. 28-1 (Ex. B) at 2.) Former

---

[3] The sixteen individuals identified in former Attorney General Bondi's posts had all been charged by criminal complaint with assaulting, resisting, or impeding a federal officer pursuant to 18 U.S.C. § 111(a), and all but two made their initial appearance on January 28, 2026. *See United States v. Ahmed*, No. 26-mj-24-JRT-ECW (D. Minn. Jan. 28, 2026), Dkt. 6; *United States v. Valentine*, No. 26-mj-28-DSD-LIB (D. Minn. Jan. 28, 2026), Dkt. 5; *United States v. Tschida*, No. 26-mj-54-JNE-ECW (D. Minn. Jan. 28, 2026), Dkt. 7; *United States v. Rank*, No. 26-mj-56-JNE-DLM (D. Minn. Jan. 28, 2026), Dkt. 7; *United States v. Flores*, No. 26-mj-57-PAM-DJF (D. Minn. Jan. 28, 2026), Dkt. 7; *United States v. Etherington*, No. 26-mj-58-NEB-DTS (D. Minn. Jan. 28, 2026), Dkt. 7; *United States v. Charlebois*, No. 26-mj-59-SRN-SGE (D. Minn. Jan. 28, 2026), Dkt. 8; *United States v. Borowska*, No. 26-mj-61-JMB-DLM (D. Minn. Jan. 28, 2026), Dkt. 7; *United States v. Noor*, No. 26-mj-62-NEB-LIB (D. Minn. Jan. 28, 2026), Dkt. 5; *United States v. Sager*, No. 26-mj-69-MJD-DJF (D. Minn. Feb. 12, 2026), Dkt. 11; *United States v. Williams*, No. 26-mj-70-DFW-ECW (D. Minn. Jan. 28, 2026), Dkt. 7; *United States v. Vermie*, No. 26-mj-71-MJD-JFD (D. Minn. Jan. 28, 2026), Dkt. 8; *United States v.*

Attorney General Bondi again replied to her post with photographs of several of those named individuals, some showing leg shackles (including Mr. Adbebe's photograph), and standing next to a federal agent whose back is to the camera. (Dkt. 28 (Ex. A); Dkt. 28-2 (Ex. C).)

Mr. Adbebe's initial appearance took place from 3:51 p.m. to 3:55 p.m. on January 28, 2026. (Dkt. 6 at 1.) During his initial appearance, the Government moved to unseal the case, and the Court granted the motion. (*Id.*) Former Attorney General Bondi's post with Mr. Adbebe's photograph was made at 1:12 p.m. on January 28, 2026, before the case was unsealed. (*Compare* Dkt. 28, *with* Dkt. 6 (showing Mr. Adbebe's initial appearance, at which the case was unsealed, began at 3:51 p.m.).)

At 3:57 p.m. on January 28, 2026, the DHS verified X account posted the following:

> These violent Anti-ICE anarchists will not deter DHS law enforcement from arresting and deporting the worst of the worst in Minnesota.
>
> They are fighting to keep rapists, murders, drug dealers, and predators in their community.
>
> You will not stop us. This administration will not be intimidated.

(Dkt. 28-3 (Ex. E) at 2.) This post received more than 98,000 views. (*Id.*) DHS replied to this post with the photos from former Attorney General Bondi's posts, with the individual's name and a statement indicating what they were arrested for superimposed

---

*Doyle*, No. 26-mj-80-KMM-EMB (D. Minn. Jan. 28, 2026), Dkt. 5; *United States v. Johnson*, No. 26-mj-81-KMM-SGE (D. Minn. Jan. 28, 2026), Dkt. 6; *United States v. Wilson-Soler*, No. 26-mj-84-JWB-DLM (D. Minn. Feb. 12, 2026), Dkt. 8.

6

over the bottom of the photo.  (*Id.*; Dkt. 28-4 (Ex. F) at 2.)  The photo of Mr. Adbebe in

DHS's post included his full name and the language: "***ARRESTED***: ASSAULT,

SPITTING ON OFFICER" superimposed over the photo.  (Dkt. 28-4 (Ex. F) at 2.)  The

January 28, 2026 posts by former Attorney General Bondi and DHS remain on X as of

the date of this Report and Recommendation.  According to the Government, these X

posts serve the legitimate government purpose of "general deterrence."[4]  (Dkt. 27 at 16;

Dkt. 47 at 2.)

**D.    The Government Reduces the Charge Against Mr. Adbebe**

Between February 4 and 23, 2026, the Government reduced the charges against all

sixteen individuals named in the X posts discussed above to misdemeanors.[5]  In Mr.

Adbebe's case, the Government filed a Misdemeanor Information on February 5, 2026

---

[4]    The Government made this assertion in response to a Motion for an Order to Show Cause and Motion for Rule 16 Discovery, a Protective Order, and an Evidentiary Hearing brought by Mr. Adbebe due to these posts.  (*See* Dkt. 47 at 2.)

[5]    *See United States v. Ahmed*, No. 26-mj-24-JRT-ECW (D. Minn. Feb. 6, 2026), Dkt. 19; *United States v. Valentine*, No. 26-mj-28-DSD-LIB (D. Minn. Feb. 6, 2026), Dkt. 14; *United States v. Tschida*, No. 26-mj-54-JNE-ECW (D. Minn. Feb. 4, 2026), Dkt. 18; *United States v. Rank*, No. 26-mj-56-JNE-DLM (D. Minn. Feb. 4, 2026), Dkt. 17; *United States v. Flores*, No. 26-mj-57-PAM-DJF (D. Minn. Feb. 3, 2026), Dkt. 16; *United States v. Etherington*, No. 26-mj-58-NEB-DTS (D. Minn. Feb. 3, 2026), Dkt. 14; *United States v. Charlebois*, No. 26-mj-59-SRN-SGE (D. Minn. Feb. 4, 2026), Dkt. 16; *United States v. Borowska*, No. 26-mj-61-JMB-DLM (D. Minn. Feb. 4, 2026), Dkt. 16; *United States v. Noor*, No. 26-mj-62-NEB-LIB (D. Minn. Feb. 11, 2026), Dkt. 22; *United States v. Sager*, No. 26-mj-69-MJD-DJF (D. Minn. Feb. 17, 2026), Dkt. 21; *United States v. Williams*, No. 26-mj-70-DFW-ECW (D. Minn. Feb. 4, 2026), Dkt. 16; *United States v. Vermie*, No. 26-mj-71-MJD-JFD (D. Minn. Feb. 10, 2026), Dkt. 19; *United States v. Doyle*, No. 26-mj-80-KMM-EMB (D. Minn. Feb. 3, 2026), Dkt. 12; *United States v. Johnson*, No. 26-mj-81-KMM-SGE (D. Minn. Feb. 11, 2026), Dkt. 20; *United States v. Wilson-Soler*, No. 26-mj-84-JWB-DLM (D. Minn. Feb. 23, 2026), Dkt. 15.

that reduced Mr. Adbebe's charge from the felony charged in the Complaint to a misdemeanor, resulting in the cancellation of a preliminary hearing to determine probable cause for the Complaint.[6]  (*See* Dkt. 13 (order setting preliminary examination for 9:00 a.m. on February 6, 2026); Dkt. 15 (Misdemeanor Information filed February 5, 2026); Dkt. 17 (February 5, 2026 cancellation of preliminary examination after Misdemeanor Information filed).)  The Misdemeanor Information did not state the factual basis for the charge.  (*Id.* at 1.)

The Court held a status conference on February 19, 2026, during which the Court granted Mr. Adbebe's oral motion for a Bill of Particulars.  (Dkt. 21.)  The Government filed a Bill of Particulars on February 26, 2026, which stated as follows:

> On or about January 13, 2026, at approximately 2:00 p.m., Federal Protective Service (FPS) Inspectors responded to a call at the main gate of the Bishop Henry Whipple Federal Building in Fort Snelling, Minnesota regarding a protestor interfering with government vehicles.
>
> FPS Inspectors were wearing law enforcement equipment with law enforcement markings. From drone footage and photographs, FPS observed an individual on federal property engaging in disorderly conduct and disrupting the free flow of vehicles driving to and from the Bishop Henry Whipple Federal Building in violation of 6 C.F.R. § 139.35. FPS subsequently identified this individual as Defendant Kirubele ADBEBE

---

[6]    Under Rule 5.1 of the Federal Rules of Criminal Procedure, when a defendant is charged with a felony by criminal complaint, a magistrate judge must conduct a preliminary hearing to determine if the complaint is supported by probable cause at which "the defendant may cross-examine adverse witnesses," but not when "the government files an information charging the defendant with a misdemeanor."  Fed. R. Crim. P. 5.1(a)(4), (e).  A finding of no probable cause results in dismissal of the complaint.  Fed. R. Crim. P. 5.1(f).

> FPS Inspectors, along with Special Response Team (SRT) personnel, approached ADBEBE to apprehend him. After a brief struggle, ADBEBE was placed in handcuffs and placed in an FPS vehicle.
>
> ADBEBE was taken to an area away from the main gate. Upon arrival, FPS Inspectors removed ADBEBE from the vehicle and held him against the side of the FPS vehicle due to his resistance.
>
> While being held against the side of the FPS vehicle, ADBEBE intentionally turned his head and forcibly spit on Victim FPS Inspector's 3 forearm in violation of 18 U.S.C. § 111(a)(1).

(Dkt. 23 ¶¶ 4-8.)  This Bill of Particulars omitted several allegations from the Complaint, including the allegations that Mr. Adbebe had spit on a passing vehicle, kicked a vehicle's tires, opened the trunk of a moving vehicle, and had "refused repeated commands to stop resisting and place his hands behind his back."  (*Compare id.*, *with* Dkt. 1-1 ¶¶ 5-6.)  The Bill of Particulars narrowed the basis for the charge to an allegation that Mr. Adbebe "forcibly spit" on a federal officer after being apprehended and while pinned against an FPS vehicle.  (Dkt. 23 ¶ 8.)

## E.     Mr. Adbebe's Pretrial Motions

On March 11, 2026, Mr. Adbebe brought several pretrial motions.  (Dkts. 27, 30, 31, 32, 34, 35, 36.)  In his Motion for an Order to Show Cause and Motion for Rule 16 Discovery, a Protective Order, and an Evidentiary Hearing, Mr. Adbebe argued that the Government's purpose in charging him was "to facilitate an elaborate publicity stunt by the Department of Justice intended to deter other protestors from engaging in constitutionally protected speech in response to the government's unlawful execution of Operation Metro Surge."  (Dkt. 27 at 1.)  Mr. Adbebe sought relief including: an Order to Show Cause for the Government's violation of the sealing order and for conduct that

abuses the judicial process (Dkt. 27 at 10-16); discovery regarding his vindictive prosecution and outrageous government conduct defenses, including discovery regarding the charging of his case (Dkt. 30 at 2) and the staging and publication of his photo (Dkt. 34 at 18); a protective order requiring his photo to be removed from social media and preventing any further dissemination of his photo (Dkt. 35 at 18-19); and an evidentiary hearing regarding these motions (Dkt. 36 at 19).

The Court held a hearing on the Motions on April 14, 2026. (Dkt. 52.) The Government's responses to Mr. Adbebe's motions were signed by Special Assistant U.S. Attorney John R. Arboleda on behalf of the United States Attorney for the District of Minnesota (Dkt. 45 at 17; Dkt. 47 at 11), but different Special Assistant U.S. Attorneys (Robert Tucker, III, and Jessica Stark) represented the Government at the hearing (Dkt. 60 at 1). All three are Army Judge Advocates who, based on court records, are admitted to practice in this District by special permission.[7] (Dkt. 60 at 3:7-20.)

Relevant to the issues raised by the Motion to Dismiss, the Court heard argument on Mr. Adbebe's assertion that the Government had not produced any video evidence of the alleged assault Mr. Adbebe was charged with, and that third party video evidence appeared to contradict certain allegations in the affidavit supporting the Complaint. (*Id.* at 23:5-39:16.) Specifically, Mr. Adbebe argued that a bystander video published by FOX 9 news ("the FOX 9 video") called into question the statement in paragraph 6 of the

---

[7]    Apparently Mr. Arboleda received orders to return to Memphis, Tennessee sometime between filing the responses and the date of the motion hearing on April 14, 2026. (*See* Dkt. 60 at 3:14-16.)

affidavit that Mr. Adbebe "resisted by pulling away from FPS 1 and refused repeated commands to stop resisting and place his hands behind his back," as no such commands could be heard in the video.[8] (*Id.* at 24:9-12; Dkt. 27 at 5; Dkt. 1-1 ¶ 6.)  Mr. Adbebe also asserted that Special Agent Berger, who swore out the affidavit in support of the Complaint against Mr. Adbebe, "swore out a number of criminal complaints in January of 2026 that have now been entirely dismissed and often, in the view of many, because the video evidence undermined statements he wrote in his affidavits." (Dkt. 60 at 23:25-24:4.)  Because, based on the Court's review of the FOX 9 video, no one gave Mr. Adbebe the "repeated commands" referred to in the affidavit, the Court ordered the Government to investigate whether the statements in the affidavit were false or otherwise inconsistent with the Government's or other video evidence and make any appropriate *Giglio* disclosures based on the results of the investigation.[9]  (*Id.* at 33:4-21.)

Mr. Adbebe also sought discovery "regarding the potential or actual charging, declination, presentment, dismissal, recharging, or recharacterization of any criminal charges related to Mr. Adbebe" and "draft affidavits prepared in anticipation of the

---

[8]   This video begins after as federal officers approach Mr. Adbebe.  *Anti-ICE protests in Minneapolis get heated, person detained*, FOX9 (Jan. 13, 2026, at 3:44 PM CST), https://www.fox9.com/video/fmc-zrc7zrjs8my9e2w6 [https://perma.cc/WZH2-RRF8].  The video does not show any of the events leading up to the officer's decision to apprehend Mr. Adbebe and ends before the alleged spitting incident took place.  *Id.*  The Court has not been made aware of any video evidence that shows Mr. Adbebe spitting.

[9]   Even though Mr. Adbebe raised this inconsistency in a motion filed on March 12, 2026 (Dkt. 34 at 5-6), the Government was unable to state at the April 14, 2026 hearing whether anyone had looked into why the affidavit contained this "repeated commands" allegation (Dkt. 60 at 32:20-25).

potential charging of this matter by felony Complaint." (Dkt. 30 at 2-3.)  At the hearing, the Government indicated that there were documents responsive to these requests that fell within the scope of Rule 16, *Brady*, or *Giglio*, but that the Government was withholding these documents on work product grounds.  (Dkt. 60 at 35:16-19.)  In light of Mr. Adbebe's argument that work-product protection does not apply to documents where the drafter engaged in illegal conduct or fraud, and in view of the unexplained inconsistencies between the FOX 9 video and the affidavit, the Court ordered the Government to submit for ex parte review by the Court a description of the documents being withheld.  (*Id.* at 39:1-16.)

As to the Government's social media posts, the Court found that Mr. Adbebe had made the threshold showing necessary to be entitled to discovery on his vindictive prosecution and outrageous government conduct defenses.  (*Id.* at 98:14-19.)  In making this finding, the Court relied in part on the fact that the Government posted a picture of Mr. Adbebe in shackles along with "comments referring to him in a number of derogatory and inflammatory manners" on social media, and the fact that the Government provided no explanation for this conduct other than "general deterrence."  (*Id.* at 98:14-99:2.)  The Government also was unable to answer at the April 14, 2026 hearing whether the X posts made by former Attorney General Bondi and DHS violated Department of Justice policy as set forth in 28 C.F.R. § 50.2, as Mr. Adbebe argued in his motion filed on March 11, 2026.[10]  (*See* Dkt. 60 at 75:10-76:16; Dkt. 27 at 16-17.)

---

[10]    As the Court explained at the hearing, while Mr. Adbebe or the Court may not be

The Court granted Mr. Adbebe's requests for disclosure of "the identity of any DHS agents, U.S. Marshal personnel, or other government personnel who participated, took, or appeared in the staged photo of Mr. Adbebe after his self-surrender" and disclosure of "any communications by any officials at the Department of Justice or DHS regarding the publication of Mr. Adbebe's photo by Attorney General Bondi's X account or DHS's X account, or the timing of Mr. Adbebe's charging and self-surrender." (*Id.* at 94:17-95:17; *see also* Dkt. 34 at 18 (identifying discovery sought by Mr. Adbebe relating to shackles photograph and social media posts by former Attorney General Bondi and DHS).) The Court found these disclosures relevant to both Mr. Adbebe's vindictive prosecution and outrageous government conduct defenses, and further relevant to whether the Government violated the Court's sealing order and what, if any, sanction should be imposed. (Dkt. 60 at 95:18-98:20.)

The Court also issued a protective order "prohibiting the United States of America, and its officers and agents, from publicly or privately disseminating or sharing the photograph of Mr. Adbebe in shackles taken after his self-surrender while he was being processed and booked or any similar photo." (*Id.* at 91:24-92:3.) The Court explained that it found good cause for this order, "including due to the potential for such photos to impede Mr. Adbebe's right to a fair trial." (*Id.* at 92:4-6.) The Court deferred ruling on Mr. Adbebe's request for an order requiring the Government to remove the

---

able to remedy violations of Department of Justice policies, those policies inform whether the Government's conduct in this case was outrageous, reflects vindictive prosecution, or impedes the administration of justice, including Mr. Adbebe's right to a fair trial. (Dkt. 60 at 76:23-77:25.)

existing posts, as well as the Motion for an Order to Show Cause and the Motion for an Evidentiary Hearing, pending further discovery and supplemental briefing. (*Id.* at 94:6-10.)

The Court ordered the above relief at the April 14, 2026 hearing, and memorialized that order in writing on April 21, 2026. (*See generally*, Dkts. 59, 60.) More than 14 days have passed without any party appealing those orders. *See* D. Minn. LR 72.2(a)(1) ("A party may file and serve objections to the order within 14 days after being served with a copy, unless the court sets a different deadline. A party may not assign as error a defect in the order not timely objected to.").

**F.      The Government's Motion to Dismiss**

The April 14, 2026 hearing concluded at 3:15 p.m. (Dkt. 52.) At 10:39 a.m. on April 15, 2026, the Government filed the present Motion to Dismiss which stated, in its entirety:

> The United States of America, by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, and Robert G. Tucker III, Special Assistant United States Attorney, hereby requests that the Court dismiss this case without prejudice pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure.

(Dkt. 54 at 1.)

The following day, on April 16, 2026, Assistant United States Attorney Kristian Weir filed a letter with the Court responding to the concerns raised at the hearing that the Government's Sealing Petition (Dkt. 3), which Mr. Weir signed, may have contained false statements regarding the Government's purpose in seeking the sealing order. (Dkt. 56 at 1-2.) In his letter, Mr. Weir stated that "the government has since moved to dismiss

this case after a more fulsome review of the additional video evidence not available at the time the complaint issued." (*Id.* at 1.)

On April 17, 2026, Mr. Adbebe filed a response to the Government's Motion to Dismiss, arguing that dismissal in this case should be with prejudice. (Dkt. 58.) The Government has not sought to file a reply to Mr. Adbebe's response. Rather, on April 28, 2026, the Government brought a Motion to Hold Disclosure Deadlines in Abeyance Pending an Order on the Motion to Dismiss. (Dkt. 61.) This Motion did not provide any further information regarding the Government's reason for seeking dismissal, nor did it directly respond to Mr. Adbebe's arguments as to why dismissal in this case should be with prejudice, although the Government did, in a footnote, cite several cases regarding the limits on courts' authority to withhold leave to dismiss under Federal Rule of Criminal Procedure 48(a). (*Id.* at 6 n.1.)

As of the date of this Report and Recommendation, the Government has also sought dismissal of the cases against five of the fifteen other individuals who were identified in the January 28, 2026 posts by former Attorney General Bondi and DHS.[11] Each of these motions sought dismissal without prejudice and provided no reason for the dismissal.

---

[11]   *See United States v. Ahmed*, No. 26-mj-24-JRT-ECW (D. Minn. May 14, 2026), Dkt. 69; *United States v. Valentine*, No. 26-mj-28-DSD-LIB (D. Minn. Apr. 15, 2026), Dkt. 37; *United States v. Tschida*, No. 26-mj-54-JNE-ECW (D. Minn. Feb. 19, 2026), Dkt. 27; *United States v. Sager*, No. 26-mj-69-MJD-DJF (D. Minn. May 15, 2026), Dkt. 53; *United States v. Williams*, No. 26-mj-70-DFW-ECW (D. Minn. Mar. 20, 2026), Dkt. 29.

## II.    LEGAL STANDARD

Rule 48(a) of the Federal Rules of Criminal Procedure states that "[t]he government may, with leave of court, dismiss an indictment, information, or complaint." Fed. R. Crim. P. 48(a).  "The principal object of the 'leave of court' requirement is apparently to protect a defendant against prosecutorial harassment." *Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977) (per curiam).  "A district court's discretion to deny leave is sharply limited by the separation of powers balance inherent in Rule 48(a) itself." *United States v. Jacobo-Zavala*, 241 F.3d 1009, 1012 (8th Cir. 2001).  The Eighth Circuit has held that courts can withhold leave "in only the rarest of cases," either "when there has been prosecutorial harassment, including a pattern of charging, dismissing, and recharging the defendant," or when "dismissal of the charges would be *clearly* contrary to manifest public interest." *United States v. Bernard*, 42 F.4th 905, 909 (8th Cir. 2022) (citation modified).  "For a dismissal to be 'clearly contrary to manifest public interest,' the prosecutor must have had an illegitimate motive rising to the level of bad faith." *Id.* (quoting *United States v. Rush*, 240 F.3d 729, 730-31 (8th Cir. 2001) (per curiam)).

In general, a dismissal with leave of court pursuant to Rule 48(a) "is considered to be without prejudice." *DeMarrias v. United States*, 487 F.2d 19, 21 (8th Cir. 1973) (per curiam); *see also United States v. Poindexter*, 719 F. Supp. 6, 10 (D.D.C. 1989) ("[T]here remains a strong presumption in favor of a no-prejudice dismissal").  "However, when the Government seeks dismissal for an improper purpose, such as harassment, dismissal should be with prejudice." *United States v. Garcia-Lopez*, No. CR 25-437 (DWF/LIB), 2026 WL 331200, at *1 (D. Minn. Feb. 6, 2026).  While the Eighth Circuit has had little

16

opportunity to comment on the "with prejudice" application of Rule 48(a), it has

recognized that reindictment after a dismissal under Rule 48(a) can be barred in cases

involving prosecutorial abuse. *See United States v. Feldhacker*, 849 F.2d 293, 295 (8th

Cir. 1988) ("In general, absent prosecutorial abuse, a defendant does not obtain immunity

from prosecution simply because the prosecution has previously dismissed an indictment

which described the criminal acts at issue.").

Courts in other jurisdictions have found that it is within the court's authority to

order dismissal with prejudice in response to a Rule 48(a) motion. *E.g.*, *In re U.S.*, 345

F.3d 450, 453 (7th Cir. 2003) (noting that in order to protect a defendant from

prosecutorial harassment, a district court "might rightly condition dismissal on its being

with prejudice"); *Poindexter*, 719 F. Supp. at 10 ("[Rule 48(a)] has the effect of granting

authority to the court in exceptional cases to reject a dismissal without prejudice—which

would allow re-prosecution—if this would result in harassment of the defendant or would

otherwise be contrary to the manifest public interest. The Court would then instead order

a dismissal with prejudice." (footnote omitted)); *United States v. Adams*, 777 F. Supp. 3d

185, 216 (S.D.N.Y. 2025) ("dismissal with prejudice can be an appropriate judicial

remedy to vindicate Rule 48(a)'s purposes, including protecting the rights of the

defendant").

Ordering dismissal with prejudice does not necessarily threaten the separation of

powers to as great a degree as the outright denial of leave to dismiss. *See Adams*, 777 F.

Supp. 3d at 215 ("The determination of whether a dismissal should be with or without

prejudice does not entail the kind of incursion on the executive branch that an order to

pursue an unwanted prosecution would. . . . deciding whether a dismissal should be with or without prejudice involves weighing considerations that, unlike the factors that are relevant to an exercise of prosecutorial discretion, are well within the judicial wheelhouse as a matter of institutional competence.").

In determining whether dismissal should be with prejudice, courts "have generally looked to the same principles that motivate the leave of court requirement," including "to protect a defendant from prosecutorial harassment" and "to consider the public interest in the fair administration of criminal justice and the need to preserve the integrity of the courts." *United States v. Cabral-Gonzalez*, No. CR 1:25-MJ-00139-CYC, 2025 WL 3166800, at *1 (D. Colo. Nov. 13, 2025) (citation modified); *see also Adams*, 777 F. Supp. 3d at 214-15 ("In exercising their discretion to dismiss with prejudice under Rule 48(a), courts have generally looked to the same principles that motivate the 'leave of court' requirement."). In particular, some courts have considered "(1) the purpose of the government's dismissal, (2) the presence or absence of good faith, and (3) the objective effect that dismissal without prejudice would have on the defendant" in evaluating prosecutorial harassment under Rule 48(a). *United States v. Madzarac*, 678 F. Supp. 3d 42, 48 (D.D.C. 2023) (collecting cases).

In conducting this analysis, courts have raised concern about dismissal without prejudice in cases where prosecutors seek to manipulate the timing of an ongoing prosecution to gain a strategic advantage. *See Poindexter*, 719 F. Supp. at 12 ("[I]t is the Court's duty to protect defendant from the consequence of 'another prosecution at a different time . . . deemed more favorable to the prosecution' even if this could have the

18

effect of conceivably hampering the government's plans down the road."); *United States v. Fields*, 475 F. Supp. 903, 908 (D.D.C. 1979) ("[T]he government is not free to indict, dismiss, and reindict solely to achieve a more favorable prosecutorial posture.").

To be clear, when it comes to denial of a motion to dismiss, the Eighth Circuit has held that the government's decision to seek dismissal for strategic reasons does not necessarily constitute the bad faith necessary to justify the outright denial of leave to dismiss as clearly contrary to manifest public interest. *See United States v. Sprofera*, 299 F.3d 725, 727 (8th Cir. 2002); *United States v. Rush*, 240 F.3d 729, 730-31 (8th Cir. 2001). However, these cases did not involve any indication of prosecutorial harassment, which the Eighth Circuit has treated as a distinct issue from whether dismissal is "clearly contrary to manifest public interest." *See Bernard*, 42 F.4th at 909 ("There is no evidence of harassment here, only cooperation, so the only other possibility is that dismissal of the charges would be *clearly* contrary to manifest public interest." (citation modified)). In *Sprofera*, the government sought to dismiss several counts shortly before trial "to simplify and streamline the presentation of its case to the jury." 299 F.3d at 727. In appealing his conviction on the remaining counts, the defendant argued that the dismissed counts "should not have been dismissed because the government only sought dismissal to gain a strategic advantage over him." *Id.* The Eighth Circuit noted that it was "unsure what harm, if any, befell Sprofera when the district court dismissed the last three counts of the government's four-count indictment" and concluded that his argument was without merit because there was no indication that the government acted in bad faith and because its actions did not implicate prosecutorial harassment concerns. *Id.*

19

Similarly, in *Rush*, the defendant appealed his conviction on the grounds that the government dismissed a lesser count on the morning of trial "to gain a strategic advantage." 240 F.3d at 730. The Eighth Circuit concluded that the government's "alleged strategic decision to dismiss the lesser charge does not rise to the level of bad faith." *Id.* at 731. *Rush* did not involve any allegation of prosecutorial harassment. Further, neither *Sprofera* nor *Rush* considered whether dismissal should be with or without prejudice—which is the relief sought by Mr. Adbebe in this case. As such, the Court does not read *Sprofera* or *Rush* to rule out consideration of the government's strategic goals in seeking dismissal without prejudice, at least to the extent that prosecutorial harassment is at issue.

Accordingly, the Court considers as persuasive authority the cases from other jurisdictions finding the government's strategic maneuvering to constitute prosecutorial harassment warranting dismissal with prejudice. In *United States v. Salinas*, for instance, the Fifth Circuit reversed a defendant's conviction because it concluded that the dismissal of a prior indictment without prejudice under Rule 48(a) was inappropriate. 693 F.2d 348, 349 (5th Cir. 1982). In that case, the government moved to dismiss the first indictment after a jury was selected. *Id.* at 349-50. The only reason the government gave for dismissal was that "a superseding indictment will be sought." *Id.* at 350. However, during the arraignment on the second indictment, the government admitted that the reason it sought the dismissal was because it believed that several of the jurors knew the defendant and did not want to go to trial under those circumstances. *Id.* The Fifth Circuit concluded that this reason was improper under Rule 48(a), explaining:

It is apparent, therefore, that the Government used Rule 48(a) to gain a position of advantage or to escape from a position of less advantage in which the Government found itself as the result of its own election. The Government decided to repudiate the whole proceeding it had initiated rather than to utilize other avenues that were available: (1) hold a hearing on the Government's allegations that some of the jurors knew the defendant, (2) conduct additional voir dire, (3) utilize one or both of the alternate jurors who had been selected, or (4) challenge the jurors for cause. In short, the Government was not content with the prospect of trying the case to the chosen jury and trifled with the Rules of Criminal Procedure to harass defendant Salinas. For this Court to condone such conduct would invite future misconduct by the Government and open the door to the possibility of grave abuses.

*Id.* at 353 (citation modified).

Even in the absence of bad faith, some courts have found the government's attempt to delay prosecution until a more advantageous time can be inappropriate under Rule 48(a) if it constitutes prosecutorial harassment. In *Poindexter*, the government sought dismissal of several counts of an indictment without prejudice to preserve its ability to bring the charges at a more advantageous time. 719 F. Supp. at 10. The case involved certain classified materials, and the government explained that it wanted the option of trying the dismissed counts "when the broad investigation of Iran/Contra is still incomplete, and when there is at least the possibility that further developments will minimize the classified information problems." *Id.* at 11. At oral argument, the Independent Counsel stated that "his investigation is not yet complete, witnesses who are now protected by the privilege against self-incrimination may become available to testify, and while he could not 'foresee a renewal of those two counts' he did want 'to protect against a rigid barrier.'" *Id.*

21

The court characterized these explanations as "somewhat murky," but did not question the government's good faith in bringing the motion. *Id.* Rather, the court focused on the effect dismissal without prejudice would have on the defendant under those circumstances. *Id.* The court concluded that dismissal without prejudice would force the defendant to "wait in a state of uncertainty and under public obloquy for an indefinite period of time until the government decided that, somehow, for some reason, the time had become more propitious for proceeding with a trial" on the dismissed counts, and that this result "objectively, would be harassment." *Id.* at 12. The court explained that "it is the Court's duty to protect defendant from the consequence of 'another prosecution at a different time . . . deemed more favorable to the prosecution' even if this could have the effect of conceivably hampering the government's plans down the road." *Id.*

Similar concerns exist when the government charges an individual for an improper reason, and without sufficient evidence, but hopes to develop sufficient evidence at a later date. In *Fields*, the court found that the government did not have the intent or ability to prosecute the defendant at the time of the first indictment, but brought the indictment to pressure the defendant into testifying against the government's true target. 475 F. Supp. at 905-06. The government argued that it dismissed the original indictment as a result of newly discovered evidence, but the court found this explanation to be incredible. *Id.* at 906. The court concluded that because "the original indictment was the product of inappropriate conduct," its "dismissal will be deemed to have been with prejudice." *Id.* at

22

908. The court further noted that "the government is not free to indict, dismiss, and reindict solely to achieve a more favorable prosecutorial posture." *Id.*

In contrast to cases where the government attempts to gain an improper strategic advantage, "when the government faces an *unexpected* legal or factual development," dismissal without prejudice may be appropriate "to allow for the possible future development of evidence." *See Madzarac*, 678 F. Supp. 3d at 49 (emphasis added) (citing *United States v. Karake*, No. CRIM.A. 02-00256 ESH, 2007 WL 8045732 (D.D.C. Feb. 7, 2007)). In *Feldhacker*, the Eighth Circuit concluded that the dismissal of a prior indictment without prejudice "did not yield a reasonable inference of prosecutorial harassment" because "[t]he government dismissed its original case against Critz only after the trial court granted Critz's motion to suppress statements he made to investigators, with the result that the government's case on the original indictment became severely weakened." 849 F.2d at 295. The court noted that "[i]t is not argued that the government knew when Critz was initially indicted that the statement would be suppressed" and concluded that "the suppression of Critz's confession clearly constitutes a change in circumstances which justifies reindictment after a dismissal under Rule 48(a)." *Id.* Similarly, in *Karake*, the government moved to dismiss the indictment after the court issued an order suppressing certain statements by the defendant. 2007 WL 8045732, at *1. The court concluded that dismissal without prejudice was appropriate because, unlike cases "in which the government could proceed to trial yet, for tactical reasons, has sought to defer prosecution," the government could not proceed to trial at that time without the suppressed statements. *Id.* at *2.

23

Given the importance of the government's reason for seeking dismissal to a court's analysis of a motion to dismiss, courts have found dismissal without prejudice to be inappropriate when the government fails to explain its reason for dismissal. In *United States v. Derr*, the government sought dismissal without prejudice shortly before trial, and "offered no reasons for its motion to dismiss other than that dismissal would 'best meet the ends of justice.'" 726 F.2d 617, 618 (10th Cir. 1984). Without further inquiry, the district court dismissed the indictment without prejudice over the defendant's objection. *Id.* More than two years later, the government obtained a second indictment charging the defendant with the same conduct. *Id.* The trial court granted the defendant's motion to dismiss the second indictment, concluding that it had abused its discretion in granting the government's motion to dismiss without knowing the factual basis for the motion. *Id.* The Tenth Circuit affirmed the trial court's decision, explaining that "to honor the purpose of the rule, the trial court at the very least must know the prosecutor's reasons for seeking to dismiss the indictment and the facts underlying the prosecutor's decision" and that "[i]f the record contains no reasons or facts explaining the trial court's decision, the trial court's decision is effectively unreviewable." *Id.* at 619.

Similarly, in *United States v. Shanahan*, the government moved for dismissal under Rule 48(a) shortly before trial without any explanation. 168 F. Supp. 225, 226 (S.D. Ind. 1958). The Court held a hearing in order to determine the reason for the government's motion. *Id.* at 227. Despite the court's attempt to elicit a specific factual basis for the government's decision, the government chose to "stand on the somewhat

abstract ground that the motion was made 'in the interests of justice.'" *Id.* The court

concluded that

> the bare assertion that the motion is made 'in the interests of justice,' when not implemented by explanatory facts, is plainly not sufficient to justify a court in permitting the dismissal of an indictment such as the one here in question. Ultimately, it is for the court in either granting or denying leave to file the dismissal, to agree or disagree with the conclusion of the Attorney General or the United States Attorney that the dismissal is 'in the interests of justice.' How can any judge exercise the sound judicial discretion with which he is charged under Rule 48(a) when he is given absolutely no factual basis upon which to base such discretion. The answer is apparent, he cannot.

*Id.* at 229.[12]

The same concerns exist where the government's stated reasons for dismissal are

pretextual. In *Adams*, the government moved to dismiss without prejudice charges

against then New York City Mayor Eric Adams. 777 F. Supp. 3d at 190. The

government gave several reasons, including that the case had been "tainted by

'appearances of impropriety,'" and that continuing the prosecution at that time would

interfere with the Mayor's ability to govern, which would in turn threaten his ability to

assist with federal immigration enforcement. *Id.* at 191. The court concluded that no

objective evidence supported either rationale. *Id.* Rather, the court noted that after the

government made the decision to seek dismissal of the case, but while the indictment was

still pending, the Mayor announced that he would permit Immigration and Customs

Enforcement ("ICE") to operate at the Rikers Island Jail Complex. *Id.* at 191-92. The

---

[12]   The government subsequently moved for reconsideration and provided the basis for its conclusion that dismissal was in the interests of justice. *Id.* at 230. While the court did not state the government's reasons in its order, the court was satisfied with the government's explanation and granted the motion to dismiss. *Id.* at 230-31.

court noted that the Mayor's decision appeared to be contrary to New York City law, and aligned with the preferences of the administration. *Id.* at 192. The court noted that these circumstances "smack[ed] of a bargain: dismissal of the Indictment in exchange for immigration policy concessions." *Id.* at 192.

The court concluded it could not "discharge its duties properly unless the underlying motion accurately state[d] the government's reasons for dismissal" and noted that "although the court must presume good faith on the part of the prosecutor, it need not accept an 'an unsupported conclusory reason' for seeking dismissal." *Id.* at 208 (quoting *Salinas*, 693 F.2d at 352)). Rather, the court found that it could look "beyond the four corners of the motion" to determine if dismissal is warranted. *Id.* (collecting cases). Considering the record before it, the court concluded that "dismissal *with prejudice* best comports with DOJ's asserted rationales for dismissal and is necessary to vindicate Rule 48(a)'s principal object of protecting the defendant." *Id.* at 219. In reaching this conclusion, the court emphasized that its analysis turned on the effect that dismissal without prejudice would have on the defendant, not whether the government had acted in bad faith. *See id.* at 236 (declining to inquire further into whether there were indicia of bad faith after finding dismissal with prejudice better protected defendant's right to be free from prosecutorial harassment).

In sum, relevant considerations in evaluating whether dismissal under Rule 48(a) should be with or without prejudice include the government's purpose in seeking dismissal and the effect dismissal would have on the defendant. While bad faith on the government's part may be relevant to the analysis, a finding of bad faith is not necessary

to warrant dismissal with prejudice.  *Adams*, 777 F. Supp. 3d at 219; *Poindexter*, 719 F. Supp. at 10.

### III.   ANALYSIS

Here, the Government has only indirectly provided a reason for the Motion to Dismiss, stating in a letter responding to questions relating to the sealing petition that "the government has since moved to dismiss this case after a more fulsome review of the additional video evidence not available at the time the complaint issued."  (Dkt. 56 at 1.) The Government did not describe the additional video evidence, state when the Government became aware of this evidence, or explain why it caused the Government to seek dismissal, so it is unclear whether this "additional video evidence" had been in the Government's possession for some time or was obtained after the hearing on April 14, 2026 and before the Government filed its Motion to Dismiss on April 15, 2026.[13]

Mr. Adbebe argues that the Government's true purpose in seeking dismissal is to avoid making the potentially damaging disclosures that the Court ordered at the hearing, noting that "[i]t is not difficult to connect the dots between the Government's request for dismissal and its wish to avoid compliance" with those orders.  (Dkt. 58 at 18.)  Mr. Adbebe argues that dismissal without prejudice presents a serious risk of prosecutorial harassment in this case.  (*Id.*)  In particular, Mr. Adbebe argues that the Government's

_____

[13]   At the April 14, 2026 hearing, the Government was unable to explain why it filed a response on March 25, 2026 arguing one of Mr. Adbebe's discovery requests should be denied as moot because "the government has disclosed or made available for viewing to Adbebe any media in the government's possession, including video or 'audio camera' footage relating to the criminal violation concerned," yet the Government produced additional video to Mr. Adbebe two days later.  (*See* Dkt. 45 at 10; Dkt. 60 at 9:21-10:3.)

27

conduct in this case shows that its primary purpose in prosecuting Mr. Adbebe was "to use charges and a coordinated media campaign to intimidate lawful protestors." (*Id.* at 8.) Mr. Adbebe suggests that "there is more than a mere possibility that the Government could recharge Mr. Adbebe at a later time in the hopes of a more favorable outcome, such as the assignment of a different magistrate judge who will not order similar disclosures." (*Id.* at 18-19.)

The Government did not respond to these arguments other than indirectly in a footnote in its Motion to Hold Disclosure Deadlines in Abeyance Pending an Order on the Motion to Dismiss. (Dkt. 61 at 4, 6 n.1.) In that footnote, the Government argued that courts have limited discretion in ruling on a motion to dismiss pursuant to Rule 48(a), and that "the Court's power is typically limited to either (1) dismissing the case with prejudice, or (2) when the bad faith is tied to an individual prosecutor, sending "the matter back to the government, which can then reassign the case to another prosecutor." (*Id.* at 6 n.1 (quoting *Adams*, 777 F. Supp. 3d at 192, 211-14).) The Government made no argument as to why the Court should not order dismissal with prejudice in this case.[14] (*Id.*)

The Court begins with the presumption that the Government acts in good faith in seeking dismissal. *See United States v. Rose*, No. 26-MJ-104 (NEB/EMB), 2026 WL

---

[14]    By failing to respond to Mr. Adbebe's arguments for dismissal with prejudice, the Government has effectively waived any objection to dismissal with prejudice. *See Adams*, 777 F. Supp. 3d at 191 ("Notably, Mayor Adams has filed his own motion seeking dismissal with prejudice on other grounds, and DOJ has not opposed his motion, effectively waiving any objection to permanent dismissal of this case.").

795010, at *1 (D. Minn. Mar. 4, 2026) (explaining that there is no binding authority from the Eighth Circuit as to whether the Court should presume that the Government seeks dismissal in good faith, but finding it appropriate to apply such a presumption), *R. & R. adopted*, 2026 WL 793202 (D. Minn. Mar. 20, 2026).  However, even if the Court takes the Government's explanation for dismissal at face value, the Court still finds that dismissal with prejudice is appropriate.

As discussed in Section II, it is possible that an unexpected factual or legal development could justify dismissal without prejudice.  *See Madzarac*, 678 F. Supp. 3d at 49 ("[W]hen the government faces an unexpected legal or factual development and moves to dismiss without prejudice, courts routinely grant the request").  However, the Government has not provided any reason to believe any such unexpected developments exist here.  This case is significantly different than cases in which the government's evidence was unexpectedly suppressed, as in *Feldhacker* or *Karake*.  *See* 849 F.2d at 295 (defendant's confession suppressed); 2007 WL 8045732, at *1 (defendant's statements suppressed).  In those cases, it remained possible for the government to seek out other sources of evidence in order to prove its case at a later date.  *Feldhacker*, 849 F.2d at 295; *Karake*, 2007 WL 8045732, at *1.  Here, it does not even appear that the "additional video evidence" was newly discovered or unexpected; rather, the April 16, 2026 letter gives the impression that the Government had the "additional video evidence" for some time (although not when the Complaint was filed on January 26, 2026) but had not yet conducted a "fulsome review" of the video until (apparently) sometime after the April 14, 2026 hearing.  (*See* Dkt. 56.)  This renders *Feldhacker* and *Karake* distinguishable.  And

29

in any event, an indirect reference to the video evidence, without further explanation or description of the evidence, does not adequately state the Government's reason for seeking dismissal. *See Adams*, 777 F. Supp. 3d at 208; *Salinas*, 693 F.2d at 352; *see also Derr*, 726 F. 2d at 619 ("[T]o honor the purpose of [Rule 48(a)], the trial court at the very least must know the prosecutor's reasons for seeking to dismiss the indictment and the facts underlying the prosecutor's decision.").

Moving beyond the four corners of the Government's Motion to Dismiss, the Court considers the entire record. *See Adams*, 777 F. Supp. 3d at 208. The Government brought its motion less than twenty-four hours after the Court's April 14, 2026 hearing. (*Compare* Dkt. 52 (hearing concluding at 3:15 p.m. on April 14, 2026), *with* Dkt. 54 (motion filed at 10:39 a.m. on April 15, 2026).) The Government took the position at the hearing that all of the video footage available to it at that time had been turned over to Mr. Adbebe. (Dkt. 60 at 9:12-14.) Absent any further explanation from the Government, the Court concludes that there was no unexpected development with respect to video evidence between the hearing and the Government's decision to seek dismissal. Rather, the timing of the Motion to Dismiss is consistent with Mr. Adbebe's assertion that the Government's decision was prompted by the Court's discovery orders. (*See* Dkt. 58 at 18.)

Considering the history of this case, there are many reasons to believe that dismissal without prejudice could result in future charges against Mr. Adbebe constituting prosecutorial harassment. Based on the record, the Government was eager to publicize the charges against Mr. Adbebe and fifteen others during Operation Metro

Surge due to those persons' alleged "Anti-ICE" activity and to send the message that federal law enforcement "expect[ed] more arrests to come," where former Attorney General Bondi had "said it before and [will] say it again: NOTHING will stop President Trump and this Department of Justice from enforcing the law." (Dkt. 28-1 (Ex. B) at 2; Dkt. 28-3 (Ex. E) at 2.)  The Government's eagerness to accomplish these goals resulted in violations of Department of Justice policies against furnishing statements or information that may reasonably be expected to influence the outcome of a defendant's trial (where such policies acknowledge that "the release of information for the purpose of influencing a trial is, of course, always improper"), against releasing a photograph of a defendant being held in federal custody unless it serves a law enforcement function, and against releasing information that generally tends to create a danger of prejudice (including observations about a defendant's character) without serving a significant law enforcement function.[15]  *See* 28 C.F.R. §§ 50.2(a)(2), (b)(2), (b)(6)(i), (b)(6)(vi), (b)(7).

Indeed, as the Court stated at the hearing: "The Court is concerned that the Government's position and contentions with respect to this motion [for a protective order relating to the X posts] show[] that they do not take the concerns around Mr. Adbebe's right to a fair trial seriously, notwithstanding the fact that case law recognize[s] this concern, and further suggests that the Government does not intend to respect these concerns going forward." (Dkt. 60 at 93:15-21; *see also id.* at 92:4-93:14.)  The X posts and Government's arguments relating to them also cause the Court concern that, absent

---

[15]     The Government's stated goal of "general deterrence" (Dkt. 47 at 2) does not constitute a legitimate law enforcement function justifying the X posts at issue.

31

dismissal with prejudice, the Government would bring new charges against Mr. Adbebe if the Government thought it needed to reinforce the messages it was trying to send via the X posts. The Court recognizes that Ms. Bondi is no longer the United States Attorney General. *See Acting Attorney General Todd Blanche*, U.S. Dep't of Just. (Apr. 22, 2026), https://www.justice.gov/ag/staff-profile/meet-acting-attorney-general-0 [https://perma.cc/6B8W-K85J]. But the Government has not indicated that Ms. Bondi's departure from the Attorney General position changes the Government's position as to the appropriateness of the X posts (which are still available as of the date of this Report and Recommendation) or the need to convey the messages they contain by recharging Mr. Adbebe should, in the Government's view, circumstances warrant doing so.

In addition, the Court finds persuasive Mr. Adbebe's concern that the Government could and would recharge Mr. Adbebe if the Government thinks it can do so under more favorable circumstances—possibly if a judge assigned to the case would be less likely to require the discovery ordered on April 14, 2026. (*See* Dkt. 59 (summarizing the discovery ordered at the April 14, 2026 hearing).) To the extent that the Government's decision to seek dismissal was prompted by the Court's discovery orders on April 14, 2026, it would constitute improper tactical maneuvering for the Government to defer prosecution rather than use the procedural avenues that were available to appeal the Court's orders. *See Salinas*, 693 F. 2d at 353 (finding that the Government "trifled with the Rules of Criminal Procedure to harass [the] defendant" when it chose to "repudiate the whole proceeding it had initiated rather than to utilize other avenues that were available" to address its concerns about certain jurors).

Other circumstances more favorable to the Government could include fading memories by witnesses and loss of the discovery ordered by the Court on April 14, 2026. Indeed, the Government stated when asking the Court to hold the disclosure deadlines in abeyance pending a ruling on the Motion to Dismiss that the discovery "did not originate in the United States Attorney's Office for the District of Minnesota, nor was the office in possession of such material" as of April 14, 2026, and "the materials reside on multiple devices in the possession of agents scattered throughout the country"—and had not yet been fully gathered. (Dkt. 61 at 5.) The Court then stayed the disclosure deadlines but ordered the Government to continue "locating, assembling, collecting, reviewing, and logging (as appropriate) the materials." (Dkt. 62.) But the way this case has unfolded gives the Court grave concern that a subsequent prosecution would result in statements by attorneys for the Government that discovery was not timely collected or preserved due to turnover in the prosecutors assigned to this case, due to miscommunication between the U.S. Attorney's Office for the District of Minnesota and the persons in possession of responsive materials at various agencies, or because their efforts to comply with the Court's order were not entirely effective.

In sum, given the circumstances of this case, the Court concludes that dismissal with prejudice is necessary to protect Mr. Adbebe from prosecutorial harassment. The Court reaches this conclusion based on the objective effect that dismissal without prejudice would have on Mr. Adbebe. An order of dismissal without prejudice would

leave Mr. Adbebe without the discovery to which the Court has found him entitled,[16] yet require him to "wait in a state of uncertainty and under public obloquy for an indefinite period of time until the government decided that, somehow, for some reason, the time had become more propitious for proceeding with a trial," *see Poindexter*, 719 F. Supp. at 12, all the while "in the dark as to what conditions might trigger renewal of the investigation or indictment," *Adams*, 777 F. Supp. 3d at 218.  This result, "objectively, would be harassment" that, due to the circumstances in this case, goes beyond the uncertainty that is "in some sense true for any defendant whose indictment is dismissed without prejudice." *See Poindexter*, 719 F. Supp. at 12; *Adams*, 777 F. Supp. 3d at 218.

The Court acknowledges that several courts in this District have recently granted requests for dismissal without prejudice under Rule 48(a), even where the Government provided no reason for dismissal. *See United States v. Rose*, No. 26-MJ-104-NEB-EMB, 2026 WL 795010 (D. Minn. Mar. 4, 2026), *R. & R. adopted*, 2026 WL 793202 (D. Minn. Mar. 20, 2026); *United States v. Williams*, No. 26-MJ-70-DFW-ECW (D. Minn. March 24, 2026).  However, the defendants in these cases did not object to dismissal without prejudice.  In *Rose*, the court noted that "the Government offer[ed] no reason for its dismissal request in its bare-bones motion," but granted dismissal without prejudice because the defendant consented to dismissal without prejudice. 2026 WL 795010, at *1. Similarly, in *Williams*, the court granted the government's motion after the defendant filed a response stating that he did not oppose dismissal without prejudice. *Williams*, No.

---

[16]    Indeed, the Government has already argued that dismissal would raise "issues of potential mootness" as to the discovery ordered. (Dkt. 61 at 7-8.)

26-MJ-70-DFW-ECW, at *1. In several other cases, courts in this District have summarily granted the Government's unexplained motions for dismissal without prejudice after receiving no objection from the defendant. *E.g.*, *United States v. Valentine*, No 26-MJ-28-DSD-LIB (D. Minn. Apr. 20, 2026); *United States v. Sager*, No 26-MJ-69-MJD-DJF (D. Minn. May 18, 2026).

In one recent case, a court in this District granted dismissal without prejudice notwithstanding the defendant's argument that dismissal should be with prejudice. *Garcia-Lopez*, 2026 WL 331200, at *1. In *Garcia-Lopez*, the government sought dismissal without prejudice after the defendant was removed from the United States by immigration authorities. 2026 WL 331200, at *1. The court noted that "any attempt to dismiss charges in order to obtain a tactical advantage would clearly constitute bad faith," but concluded that there was no evidence to indicate that was the government's purpose in seeking dismissal. *Id.* at *2. However, the court noted that the defendant had "raise[d] the legally significant question of whether there could be a fair trial on these charges in the future" and "[i]t may be that the Government's removal actions, while not improper, make reviving these charges impossible." *Id.*

The court in *Garcia-Lopez* is correct that the concerns underlying a defendant's objections to dismissal without prejudice can also be raised at the time of re-prosecution. *See, e.g., Derr*, *726* F.2d at 618 (dismissing second indictment after concluding that original indictment should have been dismissed with prejudice); *Fields*, 475 F. Supp at 907 (same). However, the Court concludes that such an approach is not sufficient to protect Mr. Adbebe from prosecutorial harassment. *Garcia-Lopez* is distinguishable for

35

several reasons.  As discussed above, the Government has only indirectly offered a vague reason for seeking dismissal of the charges against Mr. Adbebe, and there is evidence to suggest that the Government is seeking dismissal for strategic reasons implicating Rule 48(a).  Moreover, unlike Mr. Adbebe, the defendant in *Garcia-Lopez* was not the subject of a pretrial social media blitz by DHS and the United States Attorney General.

In sum, for the reasons stated above, the Court concludes that dismissal with prejudice is the only adequate remedy to protect Mr. Adbebe from prosecutorial harassment.  The Court therefore recommends that this case be dismissed with prejudice.

## IV.    RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED THAT:** the Government's Motion to Dismiss (Dkt. 54) be granted in part and denied in part and that this matter be **DISMISSED WITH PREJUDICE**.

Dated: June 3, 2026

*s/Elizabeth Cowan Wright*
ELIZABETH COWAN WRIGHT
United States Magistrate Judge

### NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local

Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).